## In the Matter of Philip S. Shaw.

Suffolk. June 10, 1998. - July 7, 1998.

Present: Wilkins, C.J., Lynch, Greaney, & Fried, JJ.

*Attorney at Law,* Disciplinary proceeding, Deceit, Suspension.

In a bar discipline proceeding, the appropriate sanction to be imposed on an attorney, who made false statements under oath, filed a false affidavit in court proceedings, and issued false and misleading opinion letters signed under oath to which he forged the notarization of another attorney, was a suspension from the practice of law for a period of two years. [768-770]

Information filed in the Supreme Judicial Court for the county of Suffolk on April 3, 1997.

The case was heard by *Marshall,* J.

*Cathleen C. Cavell,* Assistant Bar Counsel.

*Louis P. Font* for the respondent.

Greaney, J. This case concerns the appropriate sanction to be imposed on an attorney who made false statements under oath, filed a false affidavit in court proceedings, and issued false and misleading opinion letters signed under oath to which he forged the notarization of another attorney. A single justice of this court ordered that the respondent be suspended from the practice of law for a period of one year. Both the respondent and bar counsel appealed from the judgment of suspension. We conclude that the respondent should be suspended from the practice of law for a period of two years.

The background of the case is as follows. In 1986 and 1987, the respondent represented Thomas A. Toomer in many business and personal ventures and was aware, or should have been aware, of the fact that Toomer engaged in questionable business activities and did not pay his lawful debts. In the course of 1986 and 1987, Toomer, who had paid the respondent a few thousand dollars in fees, borrowed $47,000 from the respondent to pay rent and personal expenses. The respondent hoped that Toomer would repay the loan from one of his business transactions.

In August, 1987, Toomer told the respondent that he was traveling to Antwerp, Belgium, to pursue the release of funds, which Toomer believed he was entitled to, from that city's Bank Generale. From August to November, 1987, Toomer was in frequent contact with the respondent, keeping him informed that he had failed to obtain the funds.

On or about September 12, 1987, at Toomer's request, the respondent prepared and executed an affidavit entitled "Affidavit of availability of funds — Thomas A. Toomer." The affidavit was addressed to the president of Enmin Trading Company, Ltd. After executing the affidavit, the respondent forged the signature of another attorney as notary public, purportedly attesting to the authenticity of the respondent's own signature. The respondent then transmitted the Enmin affidavit. The purpose of the affidavit was to provide financial assurances to the Enmin Trading Company in its commercial dealings with Toomer. In the Enmin affidavit, the respondent stated: "I, Philip S. Shaw, member of the Bar of the Commonwealth of Massachusetts, No. 45520, on behalf of my client, Thomas A. Toomer, hereby attest to the existence and availability of funds to purchase the following bank instruments . . . Amount: 500,000,000 (Five Hundred Million) USD . . . ." At the time the respondent wrote the Enmin affidavit, he had no reasonable basis, on his personal knowledge of Toomer's finances, on which to make a statement that Toomer had access to large sums of money. In fact, all the respondent's information was to the contrary.

On or about September 16, 1987, the respondent prepared and transmitted, at Toomer's request, a letter addressed to one Zulfeqar Ali Khan in the United Kingdom, using information provided by Toomer. After preparing and signing the Ali Khan letter, the respondent again forged the other attorney's signature as the purported notary public attesting to the authenticity of the respondent's own signature. The respondent began the letter with the following statement: "On behalf of my client, Thomas A. Toomer, I hereby attest that a securities transaction has been completed in Generale de Banque, Antwerp, Belgium, and that your commission will be in excess of $3,000,000.00 US. This sum will be completely paid to you within thirty days of September 17, 1987. A sum of not more than $200,000.00 US will be paid to you within seven days of September 17, 1987." The respondent made this representation without any reasonable

factual basis to support it, and in the face of information that Toomer's transactions in Belgium had been unsuccessful. Nevertheless, when Ali Khan's attorney requested confirmation two days later that the payments would be forthcoming, the respondent wrote that Ali Khan would be receiving the payments in keeping with the commitment expressed in the letter. The payments promised to Ali Khan were never made.

On October 20, 1987, and October 22, 1987, the respondent proceeded to send letters, in furtherance of Toomer's business affairs, to an officer of Barclays Bank in London concerning the wiring of funds to an account in the name of Champcash Ltd. at that bank. In these letters to the bank, which vouched for Toomer's solvency to satisfy obligations owed the bank, the respondent forged the other attorney's signature as notary public, purportedly attesting to the authenticity of the respondent's signature.

In October, 1987, the respondent proposed to one Gregory Arabian that Arabian lend money to Toomer to complete a currency transaction involving several European banks. The respondent told Arabian that Toomer would return the loan with a four-fold profit, and that Arabian's loan would be protected from risk by a surety bond. Arabian agreed to lend $110,000 to Toomer, $10,000 of which was intended by Arabian to purchase the surety bond. On the respondent's instruction, Arabian wired $100,000 to the Champcash Ltd. account in England and gave the respondent $10,000 to purchase the bond.

Although the respondent paid $5,250 to an individual Toomer suggested could secure a bond, the respondent failed to obtain the promised bond. The respondent used the remaining $4,750 to defray expenses he had incurred in representing Toomer. Arabian subsequently lent an additional $35,000 to Toomer who defaulted on the loans causing Arabian a $145,000 loss.

Toomer was eventually indicted and tried by a jury in the United States District Court for the District of Massachusetts on three counts of wire fraud arising from the circumstances of the Arabian loans. Toomer was acquitted of the charges. The respondent testified at Toomer's trial under a grant of immunity after Toomer waived the attorney-client privilege. The respondent knowingly testified falsely that, on November 6, 1987, before Arabian lent Toomer additional funds, Arabian had told the respondent that he (respondent) could keep some of the $10,000 "as your fee."

Arabian subsequently brought an action against the respondent in the Superior Court, alleging that he had sustained damages from Toomer's default because of the respondent's failure to secure the agreed-upon bond. On March 30, 1993, the respondent signed an affidavit, filed in support of his motion for summary judgment, in which he falsely averred, under the pains and penalties of perjury, that Arabian had told him in a conversation prior to November 6, 1987, that Arabian did not need a bond. Arabian never told the respondent at any time that he no longer wanted a bond to protect his loan to Toomer.

Based on the findings of fact set forth above, the hearing committee concluded that the respondent intentionally made misrepresentations in sworn testimony at Toomer's criminal trial in the Federal court, and in a sworn affidavit submitted in a civil action in the Superior Court, thereby violating S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4) and (5), as appearing in 382 Mass. 769 (1981) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, and misrepresentation, or in conduct that is prejudicial to the administration of justice), and S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (4), (5), and (6), as appearing in 382 Mass. 785 (1981) (in his representation of a client, a lawyer shall not knowingly use perjured testimony or false evidence, knowingly make a false statement of law or fact, or participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false). The hearing committee also concluded that the respondent's forging of another attorney's name in the affixation of false notarizations to four documents violated Canon 1, DR 1-102 (A) (4), (5), and (6) (the substance of subsection [4] and [5] are set forth above; subsection [6] prohibits a lawyer from engaging in conduct that adversely reflects on his fitness to practice law), and Canon 7, DR 7-102 (A) (5). Finally, the hearing panel concluded that the respondent's misrepresentations in an affidavit to a potential investor, and in opinion letters, violated Canon 1, DR 1-102 (A) (4), (5), and (6), and Canon 7, DR 7-102 (A) (5). The hearing committee considered, as matters in aggravation, the respondent's two prior informal admonitions,[1] and recommended that he be suspended from the practice of law for two years.

[1]The respondent was admonished in 1979 in connection with the violation of various disciplinary rules, for representing a wife in a divorce proceeding while his associate represented her husband, and, after being discharged by the wife, for attempting to limit his liability by securing a release from her. In

The Board of Bar Overseers (board) adopted the hearing panel's findings of fact and conclusions of law, but, by a divided vote (seven to four), recommended that the respondent be suspended from the practice of law for a period of one year. (The four dissenting members favored the two-year suspension deemed appropriate by the hearing committee.) The single justice, after hearing, imposed a one-year suspension, and this appeal ensued.

1. In reviewing the sanction imposed by the single justice, we inquire whether the sanction is " 'markedly disparate' from the judgments in comparable cases." *Matter of Neitlich*, 413 Mass. 416, 421 (1992), and cases cited. While this standard is relatively simple to state, it is one which is not always easy to apply because of factual nuances that distinguish cases from each other. That difficulty is exemplified in this case where the hearing panel and the board focused on the same decisions to arrive at different sanctions for the respondent's misconduct.

In *Matter of Neitlich, supra*, we determined that a one-year suspension was the appropriate sanction for an attorney, who, in the course of representing a party in a postdivorce proceeding, perpetrated a fraud on the Probate and Family Court by misrepresenting the terms of his client's pending real estate transaction. In *Matter of McCarthy*, 416 Mass. 423, 431-432 (1993), we determined that a one-year suspension was an appropriate sanction for an attorney who, in a case before a municipal rent control board, elicited false testimony, introduced false documents in evidence, and failed to correct the record when he had an opportunity to do so. In *Matter of Gleason*, 10 Mass. Att'y Discipline Rep. 141 (1994), the single justice imposed a two-year suspension on an attorney who misrepresented real estate acquisition costs to his investor partners and to lenders, retained part of the inflated sales prices for himself, forged an investor's signature to a document, and induced his secretary falsely to notarize the signature. The hearing committee, relying on the cases just summarized, concluded that the respondent's misconduct went beyond what had occurred in the *Neitlich* and *McCarthy* cases, and was more comparable to the misconduct which drew a two-year suspension in the *Gleason*

1985, the respondent was admonished for neglect which caused prejudice to a client, entering into an improper contingent fee agreement, and failing to cooperate with bar counsel's investigation, in violation of several disciplinary rules.

case. In imposing a one-year suspension, a majority of the board reasoned that, like the *Neitlich* case, the respondent's misconduct arose from the representation of a single client during a discrete period of time.

We conclude that the misconduct here is more serious than what occurred in the *Neitlich* and *McCarthy* cases, and has some similarity to what occurred in the *Gleason* case.[2] While the respondent's misdeeds were done in connection with his representation and relationship with one client, they involved different transactions, harmed, or had the potential to harm, different people and entities, and culminated in the respondent's giving false statements under oath at a 1991 criminal trial, and then repeating the lie under oath in an affidavit filed in 1993 in connection with a civil proceeding in the Superior Court. In affirming a judgment of disbarment under our reciprocal discipline provision, S.J.C. Rule 4:01, § 16, as amended, 402 Mass. 1302 (1988), we stated that an attorney who lies under oath engages in "qualitatively different" misconduct from an attorney who makes false statements and presents false evidence. *Matter of Budnitz*, 425 Mass. 1018, 1019 (1997), and cases cited.[3] The respondent's misconduct is aggravated by two prior instances of discipline which disclose a purposeful disregard for ethical requirements. The whole picture depicts the respondent as an attorney who, when it serves his advantage, is willing to violate clear norms of professional responsibility and to engage in purposeful deceit which harms others. We agree with bar counsel that a suspension of one year is inadequate in this case to protect the public and the integrity of the bar.

2. In reaching this conclusion, we have considered and rejected the respondent's arguments. The decision of the board (which adopted the hearing committee's findings of fact) is supported by substantial evidence. See S.J.C. Rule 4:01, § 8 (4), as

---

[2]We ordinarily do not consider single justice decisions in bar discipline cases when a full court opinion or opinions exist that apply to the issues. Neither of the full court opinions discussed above is dispositive, and *Matter of Gleason*, 10 Mass. Att'y Discipline Rep. 141 (1994), was decided after the full court opinions. We conclude that the *Gleason* decision is relevant to our inquiry.

[3]The judgment of disbarment entered in the county court in *Matter of Budnitz*, 425 Mass. 1018 (1997), reciprocally enforced a judgment of disbarment entered by the Supreme Court of New Hampshire which granted the attorney leave to file for reinstatement after two years. It was therefore somewhat analogous to the two-year suspension sought by bar counsel in this case.

appearing in 425 Mass. 1302 (1997). The board was not required to apply criminal standards of proof which would be relevant to a criminal prosecution for perjury to a case like this involving false statements under oath. The board properly concluded, on the evidence accepted by the hearing committee and the committee's findings of fact, that the respondent had testified falsely under oath and made intentional misrepresentations. The board also properly rejected the respondent's claim that deceitful letters sent over his signature merely related Toomer's opinions on the facts contained therein and were not statements of fact by him. There is nothing to show that Toomer's death on May 31, 1994, caused prejudice in the respondent's defense of the case. Other points raised on appeal by the respondent are either meritless, unsupported by the record, or both.

3. The judgment imposing a suspension of one year is vacated. The case is remanded to the county court where a judgment shall be entered suspending the respondent from the practice of law for two years.

*So ordered.*