## In the Matter of Robert P. Hilson.

Suffolk. December 6, 2006. - March 27, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension, Attorney-client relationship, Fiduciary duty. *Administrative Law,* Substantial evidence. *Conversion.*

In a bar discipline matter, substantial evidence existed to support the Board of Bar Overseers' determination that the respondent's personal use and disbursement of certain funds he deposited in his IOLTA account on behalf of his client — a real estate broker who agreed to hold those funds in escrow, under the terms of a certain purchase and sale agreement, as the buyer's deposit toward the purchase price — amounted to a conversion of money belonging to the seller [611-612]; moreover, the conversion of those funds (which should have been held in an interest-bearing account, rather than the IOLTA account) violated the respondent's fiduciary duty to the seller as either an escrow agent or a trustee [612-615].

In a bar discipline matter alleging the disclosure of client confidences in violation of Canon 4, DR 4-101 (B), the respondent's reliance on the advice of counsel was not a defense, and the evidence was sufficient to establish that the relevant disclosure was embarrassing [616].

Substantial evidence supported the Board of Bar Overseers' conclusion that the respondent in a bar discipline matter knowingly gave false testimony [616-617].

The appropriate sanction for an attorney who converted certain funds, violated his fiduciary duty, disclosed client confidences, and knowingly gave false testimony was, as recommended by the Board of Bar Overseers, indefinite suspension from the practice of law. [617-619]

Information filed in the Supreme Judicial Court for the county of Suffolk on July 27, 2006.

The case was reported by *Greaney,* J.

*James S. Bolan* (*Sara N. Holden* with him) for the respondent.

*Dorothy Anderson,* Assistant Bar Counsel.

Spina, J. The Board of Bar Overseers (board) filed an information with the county court recommending that the respondent, Robert P. Hilson, be suspended indefinitely from the practice of law for misconduct that includes conversion of third-party funds

he received in the course of a representation; giving testimony under oath that was intentionally or recklessly false, and unnecessarily revealing client confidences. The respondent challenges the findings and conclusions of the board. The single justice reserved and reported the case, without decision, to the full court. We adopt the findings and conclusions of the board, and we order that the respondent be suspended indefinitely from the practice of law.

1. *Background.* A special hearing officer found the following facts, which were adopted by an appeal panel of the board and by the full board. Differences between conclusions of the special hearing officer and the appeal panel, whose conclusions were adopted by the board, will be noted.

The respondent represented a real estate broker who had agreed to hold in escrow, under the terms of a purchase and sale agreement dated December 7, 1994,[1] the buyer's deposit of $34,200 toward the purchase price. After the buyer defaulted, a dispute between the realtor and the seller arose over the deposit: the broker claimed fifty per cent under the terms of the purchase and sale agreement; the seller claimed the entire deposit under the terms of a prior listing agreement.

The respondent filed an interpleader action claiming fifty per cent of the deposit on behalf of the broker. He also stated that the seller claimed an interest in the deposit. The broker had spent most of the deposit. At the respondent's urging, the broker obtained $35,100 to cover the deposit, plus interest, and sent it to the respondent. The respondent then deposited this money in his IOLTA account, where he held it on behalf of the broker with full knowledge of the terms of the purchase and sale agreement, including the fact that the broker was an escrow agent thereunder.

The trial judge denied a pretrial motion by the seller to

---

[1] Dates are supplied primarily because the conduct in question occurred during a change in the rules governing professional conduct, as well as amendments to particular rules. The Canons of Ethics and Disciplinary Rules were reorganized, effective January 1, 1981, 382 Mass. 698, 768 (1981). They were replaced, effective January 1, 1998, by the Rules of Professional Conduct, 426 Mass. 1303 (1998). A rule change concerning trust accounts became effective October 1, 1995. S.J.C. Rule 3:07, DR 9-102, as appearing in 419 Mass. 1303 (1995).

compel the deposit of the monies with the court. The respondent opposed the motion, arguing as one of his grounds that the seller had not shown that any portion of the deposit had been converted. The trial judge denied a similar motion at the conclusion of the trial, and explained he would make a decision quickly. He stated further that he assumed the respondent would not do anything with the funds until a decision was rendered.[2] A declaratory judgment entered on September 20, 1995, that provided the seller was entitled to fifty per cent of the deposit, plus five per cent interest, and that the broker and a cobroker each were entitled to twenty-five per cent, without interest. There was no award of attorney's fees or order for equitable relief.

The respondent distributed checks conformably with the judgment.[3] The attorney for the seller subsequently wrote to the respondent on October 2, 1995, requesting that no monies be disbursed until the appeal period expired. He thereafter filed a notice of appeal. Apparently concerned that the appeal would be compromised if he cashed the check issued to the seller, the seller's attorney returned the check to the respondent by letter dated October 10, and directed him to deposit the escrowed funds in an interest-bearing account with the seller as signatory.

On October 16, 1995, the respondent wrote to the seller's attorney, notifying him that he had disbursed money to the broker and the cobroker. He indicated he would not deposit the returned check in an interest-bearing account, but that he would hold the money in his IOLTA account. The respondent apprised the broker of the status of the case in a letter dated October 25. He informed her that he would hold the funds returned by the seller in his IOLTA account "pending further action." The respondent knew at this time that he would be holding a substantial sum of money for a significant period of time.

On October 31, 1995, the seller's attorney wrote to the respondent and asked him to retrieve all disbursed funds and place them in an interest-bearing account pending the appeal.

---

[2]The preceding facts in this paragraph, although not in the findings of the special hearing officer, are undisputed.

[3]The respondent presented a disbursement authorization to the broker that she signed before the checks were disbursed.

The respondent replied on November 2, pointing out that there had been no court order preventing the disbursement. He suggested that any relief be sought from the court, and that it be directed at the parties, and not at him. The seller's attorney filed a motion to compel the broker and the cobroker to return the disbursed funds pending the appeal, and if they were to default in their performance, that the respondent be ordered to replace the disbursed funds. The motion was denied, after hearing, on January 17, 1996. Before the hearing, the respondent offered to give a check in the amount of $17,787.96 to the seller's attorney. On January 17, after the hearing, and again on February 2, 1996, the seller's attorney wrote to the respondent and asked him to reissue the check to the seller, without prejudice to the seller's right to pursue the appeal. The respondent stood silent each time.

In February, 1996, the broker was injured and was unable to work. During April, 1996, the respondent had several conversations with her about his outstanding legal bill. He expressed concern about when he would be paid.

In the middle of May, 1996, the respondent telephoned the broker's home and left a message on her answering machine. The broker had been hospitalized for depression, so her husband returned the call. The respondent explained that he was releasing the funds he was holding and wanted his bill paid. He asked that the broker come to his office to sign the necessary paperwork. On May 20, 1996, the broker and her husband drove to the respondent's office. The broker waited in the car while her husband went inside to get a check drawn on the respondent's IOLTA account, payable to the broker in the amount of $17,787.96. The broker endorsed the check, and also signed a disbursement authorization form, which has never been produced. Her husband brought the two signed items to the respondent, who handed him a check drawn on the respondent's money market account payable to the broker in the amount of $9,000. He then deposited the $17,787.96 check to his money market account. This deposit covered the $9,000 check to the broker, a $3,700 check he deposited to his IOLTA account on behalf of the broker for an unrelated matter, and $5,087.96 in full satisfaction of the amount the broker owed him at the time ($5,088.10).

In late October, 1996, the respondent filed a motion to withdraw from his representation of the broker in the interpleader matter, citing a breakdown in the attorney-client relationship. The seller's attorney opposed the motion on the ground that the respondent was holding funds belonging to the seller. The respondent stated in open court that he was no longer holding the funds. He was allowed to withdraw. After the respondent resisted discovery regarding the escrowed funds, a judge ordered him to deposit $17,787.96 with the court "forthwith" (February 4, 1997). He deposited $17,787.96 with the court on March 25, 1997, following an unsuccessful interlocutory appeal in which a single justice of the Appeals Court concluded that the basis of the order that the respondent deposit the money forthwith was that he was acting as an escrow agent for the broker and for others.

In the meantime, the seller filed an action against the respondent and the broker alleging breach of contract by the broker, breach of fiduciary duty by the respondent, and violations of G. L. c. 93A by both. The respondent filed cross claims against the broker for outstanding legal fees, and, based on allegations that the broker demanded that he disburse the $17,787.96 he had been holding, indemnification and contribution for any amount recovered by the seller. In the course of discovery on the c. 93A litigation, the seller scheduled the deposition of the broker, who was unrepresented. The broker was questioned on October 6, 1997, by the seller's attorney, by the respondent's attorney, and by the respondent himself. The respondent personally asked the broker, his former client, about confidential matters, including the name (an acronym) of her corporation; her misuse of the escrow funds before the interpleader action had been filed; whether she or any member of her family had drug or alcohol problems; whether she had been accused or convicted of stealing buyer deposit money; whether her son had been accused of sexual assault; whether her daughter was pregnant and unmarried; whether she had been evicted from her residence; whether she and her husband were in the process of divorcing, and the reasons; and whether she was being pursued by creditors.

During the trial of the G. L. c. 93A litigation in September,

1999, the respondent testified that on May 20, 1996, he wrote a check to the broker for $17,787.96, at her direction, from his IOLTA account, and that he handed it to her in the waiting area of his office. He knowingly testified falsely that he did not write any other checks to her on that day. He also testified that she later returned and paid his bill for legal fees in the amount of $5,029.96. Later that day, the seller's attorney issued a subpoena to the keeper of the records of the respondent's law office for production of the respondent's bank records. The respondent searched the records stored in his basement and located the $9,000 cancelled check he gave the broker on May 20, 1996. He brought it to court the next day. The case against the respondent settled before court reconvened. He agreed to pay the seller $29,000, which sum has been paid. Judgment entered against the broker in favor of the seller in the amount of $17,787.96, and all funds held by the clerk's office were ordered released to the seller. Judgment also entered against the broker in favor of the respondent in the amount of $6,339.94 on his cross claim for legal fees owed.

The board concluded that the respondent committed the following violations of the Canons of Ethics and the Rules of Professional Conduct:

(a) The respondent converted funds to his own use and to the use of the broker that, based on the allegations of his interpleader complaint and based on the court's judgment of September 20, 1995, he knew belonged to the seller, in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), 382 Mass. 769 (1981) (conduct involving dishonesty, fraud, deceit, or misrepresentation); S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (6), 382 Mass. 769 (1981) (conduct that adversely reflects on fitness to practice law); and S.J.C. Rule 3:07, Canon 9, DR 9-102 (A), as appearing in 419 Mass. 1303 (1995) (effective Oct. 1, 1995) (funds held in trust by lawyer or law firm shall be deposited in accounts in State where law office is located, and the accounts shall be clearly identified as "trust accounts," "escrow accounts," "client funds accounts," "conveyancing accounts," or "IOLTA accounts," or words of similar import indicating fiduciary nature of account); S.J.C. Rule 3:07, Canon 9, DR 9-102 (B), as appearing in 419 Mass. 1303 (1995) (effec-

tive Oct. 1, 1995) (preserving identity of funds and property of client); and S.J.C. Rule 3:07, Canon 9, DR 9-102 (C), as amended, 419 Mass. 1306 (1995) (effective Feb. 1, 1995) (same; short-term pooled [IOLTA] trust accounts, and longer term individual trust accounts paying interest);

(b) The respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of DR 1-102 (A) (4), conduct prejudicial to the administration of justice, in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (5), 382 Mass. 769 (1981), and conduct that adversely reflects on his fitness to practice law, in violation of DR 1-102 (A) (6), by disbursing money to himself and the broker in breach of a fiduciary duty he undertook to hold the money in escrow for the seller;

(c) The respondent failed to deposit money he was holding for the seller, in trust, to an interest bearing account, in violation of DR 9-102 (C);

(d) By disbursing money to the broker that he was holding in escrow for the seller without advising her that her use of the money would expose her to potential liability, the respondent prejudiced or damaged the broker, his client, during the course of a professional relationship, in violation of S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (3), 382 Mass. 784 (1981)[4];

(e) When he disclosed client confidences during the deposition of the broker on October 6, 1997, the respondent violated S.J.C. Rule 3:07, Canon 4, DR 4-101 (B) (1), 382 Mass. 778 (1981) (revealing client confidence or secret); S.J.C. Rule 3:07, Canon 4, DR 4-101 (B) (2), 382 Mass. 778 (1981) (using client confidence or secret to client's disadvantage); and DR 4-101 (B) (3) (using client confidence or secret for advantage of lawyer or third person, without client's consent, after full disclosure); and the respondent failed to show that disclosure was necessary

---

[4]The special hearing officer concluded that by disbursing funds to the broker without advising her that his professional judgment on her behalf was or might be affected by his own personal and financial interests (the funds were disbursed at a time when the respondent was concerned that the broker was unable to pay his outstanding billing statement), the respondent violated S.J.C. Rule 3:07, Canon 5, DR 5-101 (A), 382 Mass. 779 (1981). The appeal panel and the board do not address this conclusion. We conclude that the record supports the findings and conclusion of the special hearing officer as to this violation.

to establish or collect his fee or defend himself or his employees or associates against an accusation of wrongdoing. See S.J.C. Rule 3:07, Canon 4, DR 4-101 (C) (4), 382 Mass. 778 (1981)[5];

(f) By giving intentionally false testimony or by testifying in September, 1999, with reckless disregard for the truth or falsity of the fact that he gave the broker, at her direction, only one check ($17,787.96) on May 20, 1996, the respondent violated Mass. R. Prof. C. 3.3 (a) (1), 426 Mass. 1383 (1998) (lawyer shall not knowingly make false statement of material fact or law to tribunal); Mass. R. Prof. C. 3.3 (a) (4), 426 Mass. 1383 (1998) (lawyer shall not knowingly offer evidence he knows to be false)[6]; Mass. R. Prof. C. 8.4 (c), 426 Mass. 1429 (1998) (conduct involving dishonesty, fraud, deceit, or misrepresentation); Mass. R. Prof. C. 8.4 (d), 426 Mass. 1429 (1998) (conduct prejudicial to administration of justice); and Mass. R. Prof. C. 8.4 (h), 426 Mass. 1429 (1998) (conduct that adversely reflects on fitness to practice law).

*2. Standard of review.* "[S]ubsidiary facts found by the [b]oard and contained in its report filed with the information shall be upheld if supported by substantial evidence, upon consideration of the record." S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). The special hearing officer is "the sole judge of the credibility of the testimony presented at the hearing." S.J.C. Rule 4:01, § 8 (4).

---

[5]The special hearing officer concluded there was no violation of S.J.C. Rule 3:07, Canon 4, DR 4-101 (B) (1), (2), or (3), 382 Mass. 778 (1981), because, although deplorable, the disclosure was "appropriate" because they were the explanations given by the broker to the respondent not to pressure her to pay his outstanding bill. The appeal panel concluded there had been a violation, reasoning that the standard is more than "appropriate"; disclosures must be "necessary." S.J.C. Rule 3:07, Canon 4, DR 4-101 (C) (4), 382 Mass. 778 (1981).

[6]The appeal panel and the board correctly rejected the conclusion of the special hearing officer that the respondent violated Mass. R. Prof. C. 3.3 (a) (2), 426 Mass. 1383 (1998) (lawyer shall not knowingly fail to disclose material fact to tribunal when disclosure necessary to avoid assisting criminal or fraudulent act by client, except as provided in Mass. R. Prof. C. 3.3 [e], 426 Mass. 1383 [1998]), because the rule addresses fraud by a client. Here, the fraud was perpetrated by the respondent, not the broker, his client, so the rule does not apply.

See *Matter of Saab*, 406 Mass. 315, 328 (1989). Her credibility determination will not be rejected unless it can be " 'said with certainty' that [a] finding was 'wholly inconsistent with another implicit finding.' " *Matter of Barrett*, 447 Mass. 453, 460 (2006), quoting *Matter of Hachey*, 11 Mass. Att'y Discipline Rep. 102, 103 (1995). The conclusions and recommendations of the board are entitled to great weight but are not binding on this court. *Matter of Fordham*, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). We are empowered to reach our own conclusions. *Matter of Anderson*, 416 Mass. 521, 525 (1993).

3. *Conversion*. The respondent does not address specifically the issue of conversion other than to claim that this case "does not involve an attorney stealing funds"; that the funds belonged to his client (the broker); and that because he did not hold the funds in escrow, a point discussed later, there was no restriction on the funds and there was no conversion of escrow funds. The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment. *Spooner* v. *Holmes*, 102 Mass. 503, 506 (1869). Money may be the subject of conversion. *Morrin* v. *Manning*, 205 Mass. 205, 211 (1910). There is no requirement that the one converting property be shown to have had the intent to deprive permanently the rightful owner of its use and enjoyment, as in stealing. Cf. *Commonwealth* v. *Johnson*, 379 Mass. 177, 181 (1979). There is no requirement that the property be held in trust or in escrow. In particular, bar counsel's case does not depend, as the respondent suggests, on a showing that the respondent held funds as a fiduciary. The restriction on the funds was that they belonged to the seller, the respondent had agreed to hold them pending appeal, and he was not free to do with them as he pleased.

Here, the respondent was holding money that he knew belonged to the seller. He refused to surrender the money after receiving two written demands from the seller's attorney in January and February, 1996, he disbursed the money for his own use and the use of the broker, without right, and he thereby deprived the seller of the use and enjoyment of the money. The

respondent's contention that he disbursed this money to the broker at her direction and because he thought it belonged to her has been rejected by the credibility determinations of the special hearing officer. It also is belied by the precise assertions in his complaint for interpleader that the broker claimed no more than one-half the deposit; the fact that he invoked the interpleader process to resolve any questions of ownership in the deposit; his knowledge of the judge's decision declaring the seller to be entitled to $17,100, plus interest; his agreement to hold the funds pending appeal; and his attempt on two occasions to disburse to the seller the amount awarded by the judge. The fact that the seller returned the check after the first attempt with instructions not to disburse any monies until the appellate process was concluded could not have done anything to suggest the money did not belong to the seller, or that it belonged to the broker. Moreover, the failure to take a cross appeal precluded the broker from obtaining a judgment on appeal that was more favorable than the one she received in the trial court. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 43 n.5 (1977). Finally, where the respondent persuaded the judge before trial not to order that the funds be deposited with the court precisely because there had been no showing of conversion, we infer he understood that a wrongful exercise of dominion over disputed funds, including the portion claimed by the broker, could amount to conversion by the person holding the funds even before a judicial determination of ownership.

The conclusion that the respondent's disbursement of the $17,787.96 in his possession for his own use and the use of the broker amounted to a conversion of money belonging to the seller is supported by substantial evidence. It is conduct involving dishonesty, and it adversely reflects on the respondent's fitness to practice law.

4. *Fiduciary duty*. The respondent argues that he did not violate any fiduciary duty owed to the seller because he owed no fiduciary duty to the seller. He contends there is no factual basis to find that he was acting as an escrow agent or any other type of fiduciary for the seller. The respondent makes a preliminary argument that bar counsel may not pursue alternative claims that he converted money held "in trust," held "in

escrow," or that belonged to the seller. He cites no authority to support his position. Modern rules of pleading permit alternative pleading. See, e.g., Mass. R. Civ. P. 8 (e) (2), 365 Mass. 749 (1974); *Linthicum* v. *Archambault*, 379 Mass. 381, 386 (1979). See also *Commonwealth* v. *Murphy*, 442 Mass. 485, 502 (2004) (alternative defenses); *Commonwealth* v. *Rolon*, 438 Mass. 808, 816-817 (2003) (alternative theories advanced by prosecution); *Commonwealth* v. *Lazarovich*, 410 Mass. 466, 476 (1991) (alternative defense). There is nothing in the board's rules that prevents alternative pleading, and we see no reason to preclude its use. The respondent also has not demonstrated any prejudice.

The respondent further contends, as a preliminary matter, that he could not owe a fiduciary duty to the seller while he was serving as attorney for the broker, as a matter of law. We disagree. Attorneys often are called on to hold funds of a third party in connection with a representation, and are not automatically precluded from doing so because they are acting as attorney for a person involved. Supreme Judicial Court Rule 3:07, Canon 9, DR 9-102 (A), states in relevant part:

> "Funds held in trust include funds held for clients and in any other fiduciary capacity in connection with a representation, whether as trustee, agent, guardian, executor, or otherwise. Whenever 'client' or 'clients' is referred to in this Disciplinary Rule, it shall be intended to refer to any person or entity on whose behalf a lawyer or law firm holds funds in trust."

Disciplinary Rule 9-102 (A) expressly permits an attorney to hold funds of a third party in trust in connection with a representation. This currently is permitted under Mass. R. Prof. C. 1.15 (a), 426 Mass. 1363 (1998) (safekeeping property of clients or third persons).

The respondent next contends that the evidence was insufficient to establish that he was holding the money in escrow, especially where there was no written escrow agreement. An escrow agreement consists of the delivery of money or other valuable object by one party and a promise by the other to hold it until the performance of a condition or the happening of a

certain event. *Childs* v. *Harbor Lounge of Lynn, Inc.*, 357 Mass. 33, 35 (1970). There need not be an express writing signed by the parties. *Kaarela* v. *Birkhead*, 33 Mass. App. Ct. 410, 412 (1992). "It is 'the intention of the parties at the time of deposit [with the agent that] is controlling.' " *Id.* at 413, quoting *Progressive Iron Works Realty Corp.* v. *Eastern Milling Co.*, 155 Me. 16, 20 (1959).

There is substantial evidence to support various escrow theories. The complaint for interpleader alleged that the broker was holding the money pursuant to the escrow provisions of the purchase and sale agreement. The broker transferred the (replenished) escrow funds to the respondent, at his direction, and he thereby acted in her stead, or as her assignee, and assumed responsibility as escrow agent. Alternatively, there was a modification of the escrow provisions of the purchase and sale agreement whereby the broker and the seller ratified, by their conduct, a substitution of the respondent for the broker as escrow agent. Yet another viable theory is the existence of an independent escrow agreement between the broker (by tacit consent), the seller, and the respondent that the respondent would hold the funds in escrow pending the outcome of the appeal, as evidenced by the letters of the seller's attorney dated October 2 and 10, 1995, and the respondent's letters of October 16 and 25, 1995. The appeal panel of the board correctly passed over a discussion of the many technical questions raised as to the precise label to put on the relationship and instead focused on the "straightforward nature of the transaction, which was a simple entrustment of funds by one lawyer to another." Needless to say, there is substantial evidence to support the conclusion that the respondent was acting as escrow agent for the broker and the seller, or even for the seller alone after the seller's attorney returned the check and the respondent agreed to hold it pending appeal. The ongoing dispute whether the account should bear interest did not vitiate the existence of the escrow relationship.

As escrow agent, the respondent had, at least, a fiduciary duty to hold the money for the seller pending appeal, and we need not address the question whether he had a duty to make advance disclosure to the seller that he was preparing to disburse

the funds he was holding. See *Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 626-627 (1996).

There also was substantial evidence that the respondent held the money in trust for the seller. As with an escrow, creation of a trust depends on the intention of the parties as manifested by their words and conduct. *Povey* v. *Colonial Beacon Oil Co.*, 294 Mass. 86, 90 (1936). No specific instrument is required. *Matter of Bailey*, 439 Mass. 134, 146-147 (2003). Here, the money was transferred by the broker to the respondent, at his direction, for the specific purpose of effectuating the terms of the escrow provision of the purchase and sale agreement. This created a trust for the benefit of the broker and the seller. See *Carpenter* v. *Suffolk Franklin Sav. Bank*, 362 Mass. 770, 776-778 (1973). If not a continuation of that same trust, a new trust was created when the seller's attorney returned the check with specific instructions that the respondent hold it pending appeal, which the respondent agreed to do. See *id.* at 777-778.

The respondent owed a fiduciary duty to the seller, and he violated that duty by converting funds of the seller to his own use and the use of the broker. See *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. 407, 412-413 (2003). See also *Frontier Enters., Inc.* v. *Anchor Co. of Marblehead*, 404 Mass. 506, 511 (1989) (attorney may be liable for disbursing to client funds belonging to third party); *General Exch. Ins. Corp.* v. *Driscoll*, 315 Mass. 360, 365 (1944) (attorney owed duty to third party to hold funds "earmarked" for him that attorney received in course of representation).

Because the respondent had reason to know that he would be holding the money in trust for a significant period of time pending an appeal, he should not have held the money in his IOLTA account, but in an interest-bearing account. This especially is true where the trial judge ordered interest at five per cent from the date of the purchase and sale agreement; where the respondent had instructed the broker, his client, to send him the amount of the deposit, plus interest (which he held pending trial); and where the purchase and sale agreement provides that accrued interest on the escrow deposit belonged to the seller, implying a requirement that the funds be held in an interest-bearing account. See DR 9-102.

5. *Disclosing client confidences.* The respondent contends that he did not violate Canon 4, DR 4-101 (B) (1), (2), and (3), because, as the uncontroverted evidence demonstrates, he acted on advice of counsel. He further argues that bar counsel failed to show that the broker was "embarrassed" by the disclosure.

To establish a violation of DR 4-101 (B), bar counsel must show (1) that the respondent revealed information about a client; (2) that he had obtained the information in the context of his professional relationship with a client; (3) that the disclosure was embarrassing or was likely to be detrimental to a client; and (4) that the exception set out in DR 4-101 (C) did not apply. See DR 4-101 (A). The respondent only argues that bar counsel's proof was deficient as to the third element.

The broker testified that the disclosures caused her to feel "[a]ngry," "upset," and "betrayed." This is sufficient. The respondent's questions were designed to embarrass the broker, his client, with unfavorable information, and they were successful because they provoked comparable negative feelings. Bar counsel's proof did not fail because the broker did not say precisely she was embarrassed. The questioning upset her and left her feeling betrayed. These feelings certainly include embarrassment.

The respondent's second point, that he relied on the advice of counsel, is not a defense to a charge of unethical conduct. *Matter of Lupo*, 447 Mass. 345, 357 (2006).

6. *False testimony.* There is no merit to the respondent's claim that the special hearing officer failed to make the necessary finding that he *knowingly* gave false testimony. The special hearing officer began her discussion of the issue by restating the charge: the respondent gave "intentionally false testimony or [he testified] with reckless disregard for the truth or falsity" as to having written a $9,000 check on his money market account payable to the broker. She expressly did not credit the respondent's testimony and credited the broker's testimony and that of the broker's husband. The special hearing officer ended her discussion by stating she "conclude[d] that the [r]espondent violated the disciplinary rules *as charged*" (emphasis added).

Contrary to the respondent's claim that bar counsel failed to

allege which testimony was made knowingly falsely, the petition for discipline is specific in that regard.

To the extent that the respondent claims the special hearing officer's credibility determinations on this issue are inconsistent with other findings, the claim fails. The bank documents alone demonstrate that the respondent tried to create the impression at the G. L. c. 93A trial in September, 1999, that he had given the broker the entire $17,787.96 drawn on his IOLTA account, when in fact her husband returned the endorsed check to him and he deposited it to his money market account. He then wrote two checks on the money market account, one for $9,000 payable to the broker, and one for $3,700 payable to himself, which he deposited to his IOLTA account for another matter involving the broker. He retained the balance in his money market account to cover the amount the broker owed him in legal fees. He just as easily could, and should, conformably with the requirement of DR 9-102 (B) (3), to maintain complete records of the handling, maintenance, and disposition of all trust funds, have written two checks on his IOLTA account: one for $9,000 to the broker, and one to himself for his legal fees; and left $3,700 in the IOLTA account to cover the broker's other matter. Instead, he created a "paper trail" that made it appear the broker had demanded the entire $17,787.96 for her own purposes, and thereby attempted to conceal his own exclusive control over the funds.

The special hearing officer properly could reject the respondent's explanation that he merely had forgotten about the $9,000 check when he testified in September, 1999, where he had created an intricate check-writing scheme that served no legitimate purpose, and where he had two years to refresh his memory from the time the broker testified contrary to his account of events during her deposition on October 6, 1997.

We are satisfied that substantial evidence supports the conclusion that the respondent knowingly gave false testimony.

7. *Sanction.* The proper sanction must be determined by that imposed in comparable cases. See *Matter of Alter*, 389 Mass. 153, 156 (1983). The recommendation of the board "is entitled to substantial deference." *Matter of Tobin*, 417 Mass. 81, 88 (1994). We may consider the cumulative effect of multiple violations

committed by a respondent. *Id.*, quoting *Matter of Palmer*, 413 Mass. 33, 38 (1992). "Although the effect upon the respondent lawyer in any discipline case is an important consideration, the primary factor is the effect upon, and perception of, the public and the bar." *Matter of Alter, supra.*

The board based its recommendation on *Matter of Schoepfer*, 426 Mass. 183, 187 (1997), where the court reaffirmed disbarment or indefinite suspension as the standard suspension for temporary or permanent misappropriation of client funds. The case before us involves third-party funds, not client funds, and we recently have held that misappropriation of third-party funds by an attorney who was not acting in the practice of law warranted a suspension for two years. *Matter of Barrett*, 447 Mass. 453, 464-465 (2006). Had the respondent simply converted third-party funds while acting outside the practice of law, a two-year suspension might be in order. However, he converted third-party funds that he received in the course of a representation, that is, in the course of practicing law.

Disbarment or indefinite suspension has been ordered for misappropriation of third-party funds in the course of, or in circumstances related to, the practice of law in the following cases: *Matter of Pemstein*, 16 Mass. Att'y Discipline Rep. 339 (2000) (misappropriation of escrow funds held for nursing care costs of client's spouse); *Matter of Kondel*, 11 Mass. Att'y Discipline Rep. 148 (1995) (conversion of estate funds owed to estate beneficiaries); *Matter of Cahill*, 10 Mass. Att'y Discipline Rep. 26 (1994) (conversion of estate funds). See also *Matter of Leary*, 5 Mass. Att'y Discipline Rep. 217, 219 n.2 (1987) (dictum, that attorney has fiduciary duty with respect to funds held for third party); *In re Madera*, 916 So. 2d 108 (La. 2005) (attorney disbarred for conversion of third-party funds); *Attorney Grievance Comm.* v. *Sullivan*, 369 Md. 650 (2002) (attorney disbarred for misappropriating estate funds while acting as personal representative of estate); *Matter of Adelman*, 293 A.D.2d 62 (N.Y. 2002) (policy of disbarment for conversion of third-party escrow funds); *Matter of Brousseau*, 697 A.2d 1079 (R.I. 1997) (attorney disbarred for misappropriating estate funds while acting as administrator). Moreover, DR 9-102 (A) makes no distinction between funds held for a client and funds held for a third party.

"The most fundamental duty which a lawyer owes the public is the duty to maintain the standards of personal integrity upon which the community relies. The public expects the lawyer to be honest and to abide by the law." ABA Standards for Imposing Lawyer Sanctions § 5.0 Introduction (1991). Although we presently discern a basis to treat differently the attorney who acts dishonestly by misappropriating the funds of another while acting outside the practice of law from the attorney who does so while acting within the practice of law, we see no reason to treat differently an attorney who misappropriates third-party funds from the attorney who misappropriates client funds when the misconduct occurs within the practice of law. It is the violation of the trust of the office, not from whom the money is taken, that is the gravamen of the ethical breach.

The respondent also knowingly gave false testimony at a trial. This misconduct alone warrants a suspension of at least two years. *Matter of Shaw*, 427 Mass. 764 (1998) (two-year suspension for false statements under oath, false affidavit, and false and misleading opinion letters); *Matter of Palmer*, 423 Mass. 647 (1996) (disbarment for perjury and fabricating existence of two codicils); *Matter of Sprei*, 10 Mass. Att'y Discipline Rep. 246 (1994) (disbarment for twice making false representations under oath in disciplinary proceedings). Here, the respondent did not simply knowingly give false testimony, he devised an elaborate paper trail to conceal his control over the third party funds and create the impression that the broker had exclusive control over the funds. Then he disclosed client confidences in an attempt to discredit the broker, his client, so that her version of events would be disbelieved and his would be believed.

In aggravation, the special hearing officer found that the respondent had substantial experience in the practice of law, see *Matter of Luongo*, 416 Mass. 308, 311-312 (1993); his hearing testimony demonstrated a fundamental lack of understanding or acknowledgment of his ethical obligations, see *Matter of Clooney*, 403 Mass. 654, 657 (1988); and his conduct clearly was motivated by his own financial interests and personal gain, see *Matter of Pike*, 408 Mass. 740, 745 (1990). The appropriate sanction, as recommended by the board, is an indefinite suspension from the practice of law.

The matter is remanded to the single justice for the entry of an order that the respondent be suspended indefinitely from the practice of law.

*So ordered.*