JONATHAN M. ZANG vs. NRT NEW ENGLAND INCORPORATED.[1]

No. 09-P-864.

Suffolk. January 19, 2010. - September 14, 2010.

Present: KATZMANN, GRAINGER, & MEADE, JJ.

*Practice, Civil,* Summary judgment. *Escrow. Contract,* With broker, Sale of real estate. *Fiduciary. Real Property,* Sale. *Broker,* Commission.

In a civil action brought in Superior Court alleging, inter alia, breach of fiduciary duty arising from the refusal by the defendant real estate broker-age (a real estate seller's agent) to disburse, from funds it held in escrow, a portion of the plaintiff real estate buyer's deposit to the buyer's agent, in contravention of the explicit written instructions of the principals, i.e., the buyer and seller, in the purchase and sale agreement that created the escrows, the judge erred in granting summary judgment in favor of the defendant, where the defendant assumed the fiduciary duties of an escrow agent when it accepted the buyer's deposit and deposited that sum in its escrow account, and was therefore required to act in accordance with the unambiguous instructions of the buyer and seller. [669-674]

CIVIL ACTION commenced in the Superior Court Department on August 13, 2007.

The case was heard by *Raymond J. Brassard,* J., on motions for summary judgment.

*Edward Foye* for the plaintiff.

*Jessica M. Farrelly* for the defendant.

*Robert S. Kutner,* for Massachusetts Association of Realtors, amicus curiae, submitted a brief.

KATZMANN, J. This case arises out of the purchase and sale of a Boston condominium. Asserting claims of breach of fiduciary duty and unfair and deceptive practices in violation of G. L. c. 93A, § 9, the plaintiff-buyer, Jonathan M. Zang, filed a complaint against NRT New England Incorporated doing business as Coldwell Banker Residential Brokerage (Coldwell

---

[1]Doing business as Coldwell Banker Residential Brokerage.

Banker), contending that it had violated its duties as an escrow agent by refusing to disburse a portion of the buyer's deposit to the buyer's agent and instead paying itself moneys in contravention of the principals' explicit written instructions in the agreement creating the escrows. The buyer appeals from a decision of a Superior Court judge denying his motion for summary judgment and allowing summary judgment in favor of the defendant, Coldwell Banker. We reverse and remand for further proceedings.

*Background. Factual history.* On January 4, 2006, Neil Bradford (seller) and Coldwell Banker executed an "Exclusive Right to Sell Agreement" (the listing agreement) to sell his condominium on Phillips Street in Beacon Hill (property). The listing agreement required the seller to pay Coldwell Banker "a fee for professional services of 5% of the gross sales price" and authorized Coldwell Banker to "pay all commissions payable no later than the closing date" and "retain any deposits held in escrow and apply said deposits against commission due." The listing agreement further provided that "Coldwell Banker's usual and customary practice is to compensate cooperating brokers acting as a buyer's agent in the amount of 2.5% of the contract price . . . ." Zang was not a party to that contract, and he would never become a party to that contract. On January 20, 2006, Zang called, had his first direct communication with the seller about the property, and attended an open house two days later. Alan Fincke, a sales associate affiliated with Coldwell Banker's Boston office, was present. On January 25, 2006, after contacting Fincke, Zang again viewed the property and submitted an offer to purchase the property, which was originally listed at $1,349,000, for $1,200,000. Zang provided a $1,000 check to hold the offer, which Coldwell Banker accepted but did not deposit.

After three days, negotiations reached an impasse because Coldwell Banker rejected Zang's request that it reduce its commission in order to close the gap between Zang's final offer and Bradford's counteroffer of $1,225,000. Zang then retained William Wendel of the Real Estate Café as his agent (buyer's agent) to represent him in further negotiations. In exchange for his services, the buyer's agent agreed to be compensated for his

services at an hourly rate of one hundred dollars (minimum fee of $3,000) and to rebate to Zang any commission he received from the seller in connection with the purchase of the property.

On January 28, 2006, responding to an offer to purchase the property that had been transmitted to Coldwell Banker by the buyer's agent on behalf of Zang, Coldwell Banker's sales agent Fincke stated in a recorded voicemail message to Zang: "I have no idea what you've shared with [the buyer's agent], but since he is a fellow agent and is presumably expecting to receive a full fifty percent commission for the mere writing of an offer, I thought he should understand that he may have a great deal of difficulty collecting any commission at all from Coldwell Banker." A few minutes later, Fincke telephoned Zang again and in another recorded voicemail message asked whether "you think that it's really fair that [the buyer's agent] should come in at this late date and capture half of the commission. The listing agent [Coldwell Banker real estate agent Natalia Volkova] will be expecting her half of the commission because she has the relationship with the seller, and she deserves that, and she's marketed the property, and what does Alan [Fincke] get for all of his work? Nothing. But, you know, I guess that's money in your pocket."

Eventually, the parties reached an agreed-upon sales price of $1,225,000, and they executed a purchase and sale agreement on February 6, 2006. Coldwell Banker did not sign the purchase and sale agreement. Section 7 of the purchase and sale agreement provided, in pertinent part, that Zang would make a deposit of $122,500[2] (ten per cent of the purchase price), with the balance of the full purchase price to be paid at closing. Section 21 provided:

> "All deposits made hereunder shall be held in escrow by Coldwell Banker as escrow agent subject to the terms of this agreement and shall be duly accounted for at the time for performance of this agreement. In the event of any disagreement between the parties, the escrow agent may retain all deposits made under this agreement pending

---

[2]This amount included the $1,000 previously paid plus $121,500 paid on the date of the Purchase and Sale Agreement.

written instructions mutually given by the SELLER and the BUYER."

Section 19 of the purchase and sale agreement (the fee-splitting provision) provided:

> "A broker's fee for professional services of 5% of the purchase price (i.e., $61,250.00) is due from the SELLER and is to be split evenly between Coldwell Banker (SELLER'S agent) and Real Estate Café (BUYER'S agent), the Broker(s) herein, and is to be paid at closing from SELLER's proceeds, if and only if closing occurs and deed is recorded."

In short, the seller's net sales proceeds were to be reduced by $61,250, of which $30,625 was to be paid to the buyer's agent at closing.

On February 6, 2006, Zang delivered a check for $121,500 to Coldwell Banker via the buyer's agent and the seller's agent. One day after the purchase and sale agreement was signed, Coldwell Banker deposited Zang's initial $1,000 deposit check (dated January 28, 2006), and one day later deposited Zang's subsequent check of $121,500. Coldwell Banker's "Escrow Funds Form" indicates that as of February 7, 2006, it held in escrow a total of $122,500 (the deposit), equal to ten percent of the purchase price.

Concerned in the days following the execution of the purchase and sale agreement that Coldwell Banker, through its agents, appeared to indicate its intention to contest the fee-splitting provision, Zang sent a G. L. c. 93A demand letter on March 1, 2006, to Coldwell Banker seeking assurance that the fee-splitting provision would be honored. Coldwell Banker did not respond prior to the closing thirty days later.

On March 31, 2006, the sale closed. The parties had not altered the instruction to Coldwell Banker in the purchase and sale agreement regarding the disbursement of the deposit, and in fact, the HUD-1 settlement statement signed at the closing reflected and reiterated those instructions, mutually instructing Coldwell Banker as escrow agent to disburse $30,625.00 of the seller's sale proceeds to the buyer's agent. Coldwell Banker disbursed a check to the seller in the amount of $61,250,

representing fifty percent of the deposit. However, Coldwell Banker retained the other fifty percent and refused to pay two and one-half percent to the buyer's agent.

On August 13, 2007, Zang filed a complaint against Coldwell Banker alleging breach of fiduciary duty and violations of G. L. c. 93A, both derived from Coldwell Banker's refusal to disburse the deposit as instructed in writing by its principals. Coldwell Banker answered and asserted no counterclaims. In August, 2008, Zang moved for summary judgment, and Coldwell Banker cross-moved. On January 28, 2009, after a hearing, the judge denied Zang's motion for summary judgment and allowed Coldwell Banker's motion. The judge announced his decision orally:

> "I think that there are two contracts here that each set out obligations. I do not think that . . . Zang and Bradford [the seller] had the power to affect a contractual relationship entered into previously between . . . Bradford and Coldwell Banker. I think that the principal obligation of a so-called escrow agent under a conventional real estate residential purchase & sale agreement is to distribute money of the buyer only if the real estate closing is, generally speaking, a successful one.

> "Coldwell Banker's obligations to the parties, the buyer and the seller, as an escrow agent . . . were fully discharged when a deed passed from [the seller] to . . . Zang, when . . . Zang accepted title, and when Coldwell Banker distributed one-half of the escrowed amount or one-half of the deposit, more accurately speaking, to the seller as seller's proceeds. The other one-half of the deposit was earmarked and always understood to be earmarked as a broker's commission. There, although the parties to the buy/sell may have agreed to share it, as they did, one of the parties to that contract had a previously binding contract not to do so. I don't see any remedy that . . . Zang has against Coldwell Banker."

Zang then moved for reconsideration, which the judge denied. This appeal followed.

*Discussion.* We review the allowance of a motion for summary judgment de novo. *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007). Under the familiar standard, summary judgment is

properly granted only when, if the evidence is viewed in the light most favorable to the nonmoving party, "all material facts have been established and the movant is entitled to judgment as a matter of law." *Kitras* v. *Zoning Administrator of Aquinnah*, 453 Mass. 245, 251 (2009), citing Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). "Any doubts as to the existence of a genuine issue of material fact are to be resolved against the party moving for summary judgment." *Ibid.*

"After the execution of the contract of sale, a broker's role often involves holding the down payment or deposit made by the purchaser. Sometimes a broker seeks to hold the deposit as assurance that it can be used as a fund from which a commission can be paid." Burke, Law of Real Estate Brokers § 1.11 (3d ed. Supp. 2009). This case represents such a situation. Coldwell Banker played a dual role in this transaction — as seller's agent and as escrow holder. Zang argues there is no genuine issue of material fact that Coldwell Banker as escrow holder breached its fiduciary duty by failing to pay Zang's agent two and one-half percent at the time of closing. We agree.

"An escrow agreement consists of the delivery of money . . . by one party and a promise by the other to hold it until the performance of a condition or the happening of a certain event." *Matter of Hilson*, 448 Mass. 603, 613-614 (2007). See Eno & Hovey, Real Estate Law § 28.25 (4th ed. 2004). The escrow agent need not sign an escrow agreement in order to be bound by the instructions of the principals to the transaction. See *Matter of Hilson, supra* at 614 (example of the rule that an escrow holder need not sign a written escrow agreement in order to assume the fiduciary obligations of an escrow agent); *Kaarela* v. *Birkhead*, 33 Mass. App. Ct. 410, 413 (1992) ("The deposit of . . . escrow funds constitute[s] an acceptance of the escrow arrangement").

An escrow agent owes a fiduciary duty to both parties to the escrow agreement. See *Discipline of Two Attorneys*, 421 Mass. 619, 626-627 (1996). See also Restatement (Second) of Agency app. § 14D Reporters' Notes at 60 (1958) ("Although the escrow holder is not the agent of either of the parties, he is a fiduciary of both of them"). See generally *Gulf Petroleum, S.A.* v. *Collazo*, 316 F.2d 257, 261 (1st Cir. 1963) (bankruptcy trustee

"is to be regarded as holding the so-called escrowed funds in trust under the terms of the agreement and not for general creditors"), cited in *Childs* v. *Harbor Lounge of Lynn, Inc.*, 357 Mass. 33, 35 (1970). The escrow agent's duty is to "keep the deposit; he could not dispose of it without the express or implied authority of the depositor." *Kaarela* v. *Birkhead, supra* at 412.[3] The escrow agent, therefore, must strictly follow the instructions of the parties to the transaction. See *Greater Boston Real Estate Bd.* v. *Board of Registration of Real Estate Brokers & Salesmen*, 405 Mass. 360, 362 n.5 (1989) ("As a matter of law, a broker who acts as an escrow holder, like any escrow holder, 'is bound to act in strict compliance with the terms of the escrow agreement' "), quoting from *Schmid* v. *National Bank of Greece*, 622 F. Supp. 704, 710 (D. Mass. 1985), aff'd, 802 F.2d 439 (1st Cir. 1986). See also *Claussen* v. *First Am. Title Guar. Co.*, 186 Cal. App. 3d 429, 437 (1986) ("The duties of a depositee . . . are created and measured by the instructions of the depositor. By accepting the deposit and by acquiescence in the instructions the depositee undertakes to perform according to the terms thereof").

Here, when Coldwell Banker accepted the $122,500 from Zang and deposited that sum in its escrow account, it assumed the fiduciary duties of an escrow agent. Coldwell Banker was required to act in accordance with the parties' unambiguous instructions. The purchase and sale agreement between the buyer and seller, together with the confirmatory HUD-1 settlement statement, provided unambiguous instructions to Coldwell Banker that it must pay two and one-half percent of the purchase price to the buyer's agent. Furthermore, Coldwell Banker retained the deposit despite knowing more than one week prior to the signing of the purchase and sale agreement that Zang intended for Coldwell Banker to pay two and one-half percent of the purchase price to the buyer's agent.

Coldwell Banker argues that it is not bound by the terms of the purchase and sale agreement because it did not sign that

---

[3]Self-dealing by the escrow agent, i.e., "collection from escrowed funds of a debt owed by a party to the escrow agreement, would be a breach of duty." *Grand Pac. Fin. Corp.* v. *Brauer*, 57 Mass. App. Ct. 407, 413 (2003), quoting from *Discipline of Two Attorneys*, 421 Mass. at 627.

agreement. The uncontested facts establish, however, that Cold-well Banker's agents were on notice of the potential dispute more than one week prior to the signing of the purchase and sale agreement and Coldwell Banker nonetheless accepted the buyer's deposit. As has been noted, the purchase and sale agreement provided, "All deposits made hereunder shall be held in escrow by Coldwell Banker as escrow agent subject to the terms of this agreement . . . ." After the parties executed the purchase and sale agreement, including the fee-splitting provision, Coldwell Banker placed the full deposit from the buyer into its escrow account, bringing the total amount that it held in escrow to $122,500. Although Coldwell Banker did not sign the purchase and sale agreement, it did accept and hold the deposit made to it by the buyer pursuant to the purchase and sale agreement with knowledge of the dispute. Therefore, the terms of the purchase and sale agreement applied to Coldwell Banker as escrow agent. See *Kaarela* v. *Birkhead,* 33 Mass. App. Ct. at 412-413. See also *Haufler* v. *Zotos,* 446 Mass. 489, 499 (2006) (escrow agent "assented to the escrow agreement on behalf of [his principal] by holding the deeds, mortgage, and sum of $5,000 in escrow until the deadline specified in the escrow agreement had passed"), citing *Kaarela* v. *Birkhead, supra.*

If Coldwell Banker disputed the terms under which it held the escrow, it should have negotiated different terms in the purchase and sale agreement and expressly made its escrow obligations subject to the terms of the listing agreement. If Coldwell Banker did not think that it could respect the parties' instructions for the escrow, it should have declined to hold the funds in the first place. In any event, once it assumed its fiduciary responsibility with respect to the funds, if it believed that moneys should not be split with the buyer's agent, it should have pursued a corrective avenue[4] rather than engaging in self-help and disbursing the disputed funds to itself. Compare *National*

---

[4]For example, an escrow agent with questions as to the proper disbursement of funds could file a complaint or cross-complaint in interpleader pursuant to Mass.R.Civ.P. 22, 365 Mass. 767 (1974), even though it denied liability to a claimant or claimants. See Mass.R.Civ.P. 22 & Reporters' Notes, third par., Mass. Ann. Laws, Rules of Civil Procedure, at 346 (LexisNexis 2009) (Rule 22 "allows the person asking relief to aver that he is not liable in whole or in part to any or all of the claimants. In other words he may plead that he owes

*Starch & Chem. Co.* v. *Greenberg*, 61 Mass. App. Ct. 906, 907 (2004) (after both the seller and buyer demanded full amount of moneys held in escrow, "[n]ot surprisingly, the escrow agent refused to release the funds to either party").[5]

Coldwell Banker argues that pursuant to the rules of the Multiple Listing Service the buyer's agent was not the "procuring cause of the sale" and that he was not entitled to any commission. We recognize that "[a]bsent a written agreement to the contrary, a real estate broker is entitled to a commission only if the broker is the efficient and predominating cause of subsequent transaction between the parties." *Cantell* v. *Hill Holliday Connors Cosmopulos, Inc.*, 55 Mass. App. Ct. 550, 555 (2002), citing *Julius Tofias & Co.* v. *John B. Stetson Co.*, 19 Mass. App. Ct. 392, 395 (1985), citing *Kacavas* v. *Diamond*, 303 Mass. 88, 91 (1939). However, we need not determine whether the buyer's agent here was the "efficient and predominating cause" because Coldwell Banker's obligation and liability arises out of its duties as a fiduciary under the escrow agreement, the terms of which were contained in the purchase and sale agreement and the HUD-1 settlement statement. See *Discipline of Two Attorneys*, 421 Mass. at 627 ("self-dealing . . .

no claimant anything; but that if he does, he does not know which"); *National Lumber Co.* v. *Canton Inst. for Sav., Bank of Canton*, 56 Mass. App. Ct. 186, 188 (2002) (purpose of interpleader is to sort out the amounts and priorities of competing claims to a fund); Smith & Zobel, Rules Practice § 67.2 (2d ed. 2007) (rule permitting deposit into court serves several purposes, including "safeguard[ing] the disputed fund for future disposition"). See generally Eisenberg, 5 Debtor-Creditor Law § 47.03[3][b], at 47-26 (2010) ("In cases of uncertainty, the escrowee may find it advisable to bring an interpleader action to determine the parties' rights under the agreement").

[5]Other courts have also recognized that the instructions come from the parties to the escrow agreement and when challenged, i.e., if there is a conflict in the instructions, "the escrow holder is obliged to take corrective steps before obeying questionable instructions." *Kirk Corp.* v. *First Am. Title Co.*, 220 Cal. App. 3d 785, 807 (1990). Cf. *Premier Ins. Co. of Mass.* v. *Furtado*, 428 Mass. 507, 510 (1998) (insurance company did not commit an unfair settlement practice when it commenced an action to obtain a determination of the disputed issue and placed the disputed proceeds in an interest-bearing bank account while the action was pending); *Phoenix Ins. Co.* v. *Churchwell*, 57 Mass. App. Ct. 612, 616-617 (2003) (same); Restatement (Second) of Agency § 383 comment a (1958) ("If there is doubt as to the legal effect [of a principal's instructions], the agent's safety lies only in referring the matter to the principal or to some one designated to determine the question").

such as an escrow holder's unauthorized collection from escrowed funds of a debt owed by a party to the escrow agreement" violates "fiduciary duty to that party to the escrow agreement").[6] Coldwell Banker breached its duty in deciding unilaterally how escrowed funds would be allocated.

Because the undisputed facts show that Coldwell Banker failed to follow the unambiguous escrow instructions issued by the principals at the time of closing, there exists no genuine issue of material fact that Coldwell Banker breached its fiduciary duty by refusing to pay two and one-half percent of the purchase price to the buyer's agent. For the foregoing reasons, the orders allowing Coldwell Banker's motion for summary judgment and denying Zang's motion for summary judgment on the claim for breach of fiduciary duty are reversed. The judgment entered in behalf of Coldwell Banker dismissing the plaintiff's complaint is reversed, and a new judgment shall enter in favor of Zang on the claim against Coldwell Banker for breach of its duties as escrow agent. We remand for further proceedings on the claim alleging unfair and deceptive practices in violation of G. L. c. 93A, § 9.

*So ordered.*

---

[6]Furthermore, in any event, we note that parties to real estate transactions and their own brokers are "free . . . to agree to different terms" from those of the standard brokerage agreement. See, e.g., *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 303 (1987), citing *Kacavas* v. *Diamond*, *supra* at 91.