In re NEW SEABURY COMPANY LIMITED PARTNERSHIP,
Debtor.

New Seabury Co. Limited Partnership and Christopher Burden,
Plaintiffs,

v.

New Seabury Properties, LLC,
et al., Defendants.

Bankruptcy No. 97–12964–WCH.
Adversary No. 02–1325.

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

Aug. 22, 2007.

David G. Sobol, John J. Monaghan, Lynne B. Nowak, Lynne B. Xerras, Holland & Knight, LLP, Boston, MA, for debtor.

Daniel E. Rosenfeld, David M. Glynn, Jeffrey L. Snow, Robert N. Michaelson, Kirkpatrick & Lockhart Preston Gates, Boston, MA, for defendants.

Douglas R. Gooding, Choate, Hall & Stewart, Paul D. Moore, Duane Morris, LLP, Boston, MA, for Joseph Korff.

Charles J. Clark, Mashpee, MA, pro se.

Andrew Z. Schwartz, Kenneth S. Leonetti, Foley Hoag LLP, Boston, MA, for Official Unsecured Creditors' Committee.

Todd A. Feinsmith, William R. Baldiga, Brown Rudnick Berlack Israels LLP, Boston, MA, for Committee of Unsecured Member Creditors.

### MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS AS TO ISSUES OF LIABILITY ON ALL COUNTS IN PLAINTIFFS' COMPLAINT

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. INTRODUCTION

The matters before the Court are cross-motions for summary judgment by which the parties seek to resolve their dispute regarding real estate signage. As part of the plaintiffs' assent to the defendants' third party plan, the parties entered into a stipulation whereby the plaintiffs turned over certain business divisions to the defendants and retained one that included a real estate brokerage. With respect to that business, the stipulation contained provisions regarding the placement of temporary and permanent signage. The parties no longer agree as to the interpretation of that language. This dispute is consistent with their history since signing the stipulation.[1] For the reasons set forth below I will enter an order granting summary judgment for the plaintiffs as to liability on all counts. I will deny the defendants summary judgment on Counts I–III. I will conduct a further hearing with respect to damages. The following constitutes my findings of fact and conclusions of law.

---

1. *See New Seabury Co. L.P. v. New Seabury Props., LLC (In re New Seabury Co. L.P.)*, 450 F.3d 24 (1st Cir.2006) (addressing and analyzing another section of the stipulation at issue).

## II. *BACKGROUND*

New Seabury Co. Limited Partnership (the "Debtor") was a debtor-in-possession in the above-captioned Chapter 11 case. The Debtor owned and operated a resort community on Cape Cod (the "Resort"). Christopher Burden ("Burden") was the president of A & C Great Island Corp., the general partner of the Debtor (collectively, the Debtor and Burden will be referred to as the "Plaintiff"). One of the assets of the Debtor was a real estate brokerage which operated New Seabury Real Estate and Sound Realty. These two entities sold real estate and managed rental property respectively.

The Debtor filed for Chapter 11 relief on March 31, 1997. Both the Debtor and secured creditor New Seabury Properties, LLC (the "Defendant"), filed disclosure statements and plans. Ultimately, the parties resolved their differences and entered into a stipulation that I approved on May 29, 1998.[2] On that same date, I entered an order confirming the Defendant's plan of reorganization.[3]

The Stipulation provided that the Defendant would obtain the assets of the Debtor with the exception of the "real estate brokerage segment of the Debtor's business."[4] With respect to the operation of that brokerage, the Stipulation provided as follows:

10. NSP and the Debtor shall, on the Effective Date of the NSP Plan, execute an agreement in a form reasonably acceptable to NSP and the Debtor, binding on each parties' successors and assigns, containing the following provisions, and failing the execution of such agreement the provisions as set forth herein shall constitute such agreement:

a. The Debtor, A & C Great Island, Inc., and Christopher Burden shall have and retain, or receive for nominal consideration, a non-exclusive license to use the registered trade name "New Seabury" in connection with real estate brokerage operations conducted by one or more of them, which license shall continue for as long as Christopher Burden or any member of his family maintain a majority ownership interest in or is involved in daily operations of such business. The license shall include a license to use the New Seabury name in marketing material.

b. The brokerage operations will have access to all resort amenities and may include pictures and information regarding the resort amenities in it marketing and other material for viewing and touring. Christopher and Nancy Burden will be afforded full membership rights in the New Seabury Club at no cost for as long as Mr. Burden has a majority ownership interest in or participates in daily operations of the brokerage operations, or for as long as either Mr. Burden or Mrs. Burden reside at New Seabury.

c. The brokerage operations will have the non-exclusive right to place reasonable temporary signage (e.g. open house signs) and permanent signage relating to real

---

2. *See* Stipulation Relating to Competing Plan of Reorganization, Objections to Confirmation, Motion for Reconsideration and Motion for Plan Modification (the "Stipulation"), Case No. 97–12964–WCH, Docket No. 384.

3. Case No. 97–12964–WCH, Docket No. 385.

4. Stipulation, ¶ 9.

estate service operations on NSP's post-confirmation New Seabury related property. The permanent signage shall be where presently located and shall be in its present form, or in a form reasonably acceptable to the Debtor and NSP, provided, however, that NSP may change the permanent signage so long as such signage is of equal visibility.[5]

Thereafter, the Plaintiff operated a real estate brokerage business at its office within the Resort. Burden has been involved with this particular business for over twenty years. The Plaintiff sells and re-sells property within the Resort and is the only real estate brokerage located in the Resort.

The Plaintiff alleges, and indeed the Defendant does not dispute, that for the three years after the parties signed the Stipulation they were able to co-exist peacefully. The permanent signs within the Resort, those signs that provide directions around the Resort, remained untouched. With minor exceptions, the Defendant and Plaintiff did not dispute where the Plaintiff placed temporary signs to indicate where it was conducting an open house for a sale of a property. The parties agreed that the placement of open house signs at the ingress and egress of the Resort and at the location of the actual open house complied with the "reasonable" requirement in the Stipulation. Occasionally, one of the signs appeared in a flower bed or on the golf course and the Defendant would remove the sign.

In the spring of 2001, however, disputes with respect to the permanent and temporary signage began. During that time, the Defendant began to alter the permanent signs. The alterations began with the Defendant painting over references to the Plaintiff's business on many of the permanent signs. Thereafter, the Defendant reinserted the Plaintiff on the signs but generally in a lower position on the sign. The Defendant did not reinsert the Plaintiff on one of the altered signs. On another permanent sign, the Defendant not only removed the sign but also removed the Plaintiff's replacement. Those signs are as follows:

1. The Three Way Sign at the intersection of Wading Place Road, Red Brook Road and Rock Landing Road (hereinafter the "Red Brook Sign")

Before the alteration, the sign appeared as follows: [6]

| Marina <br> ◁Popponesset & <br> Daniels Island | Popponesset Inn <br> Marketplace ▷ <br> Real Estate |
|---|---|
| Bright Coves <br> ◁High Wood <br> Popponesset | Resort Villas <br> Restaurants ▷ <br> Country Club |

During the alteration, the words "Marketplace" and "Real Estate" were stricken. After the alteration, the Red Brook Sign had the same physical configuration. Without the directionals which occupy the upper 1/8th of the sign, the altered Red Brook Sign is as follows:

---

5. Stipulation, ¶ 10.

6. The arrows on the actual signs are much larger than indicated by the typeface of this opinion.

| Bright Coves ◄High Woods Popponesset | Resort Villas Popponesset Inn► |
|---|---|
| Popponesset & ◄Daniels Islands Marina | Country Club & Restaurant ▻ Real Estate |

2. The Rock Landing Sign traveling south (hereinafter "the Rock Landing South Sign")

During alteration, the Rock Landing South Sign had only a direction to the Popponesset Inn. In the Debtor's photograph taken during the alteration, one can see through the paint that before the alteration the sign also had directions to the "Marketplace" and, occupying the lower 1/2 of the sign were directions to "Real Estate Information." Although three of the entries are painted over, in the picture which the Debtor provided it is obvious that prior to the alteration, the Rock Landing South Sign appeared as follows:

| Δ Popponesset Inn Marketplace |
|---|
| Real Estate ▻ Information |

Today, the Rock Landing South Sign has four directional entries. The fourth entry line is to "Real Estate." Therefore, the visibility was reduced from one-half to one-fourth. It appears as follows:

| Δ Popponesset Inn Beach Club Cabana Club |
|---|
| Real Estate ▻ |

3. The Rock Landing Sign traveling north (hereinafter "Rock Landing North Sign")

During the alteration, the lower 1/2 of the sign which had contained a direction to "Real Estate Information" had been deleted. Prior to the alteration, the sign appeared as follows:

| Δ To Route 28 |
|---|
| ◄ Real Estate Information |

Presently, the sign has four lines with single entry directions which means that the information that formerly occupied one-half of the sign now occupies one-fourth. The fourth line has an arrow and the word Real Estate. It appears as follows:

```
 △

 To Route 28
 Administrative Offices
 Guest Registration
 ◄ Real Estate
```

4. Mall Way Sign

The Mall Way Sign was a horizontal rectangle as follows:

```
 Real Estate
 Information ▷
 To Route 28
```

After the alteration, during which time the sign was removed, the reference to the Plaintiff was reduced from two thirds to one third. Today, the Mall Way Sign appears as follows:

```
 To Route 28
 Administrative Offices ▷
 Real Estate
```

The signs which the Plaintiff contends have been altered without a replacement are as follows:

1. The Real Estate Office

At the time of the Stipulation, there existed a free standing sign which appeared as follows:

```
 Real Estate Office
 Ahead 100' ▷
```

The Defendant removed the sign in April, 2001. The Debtor then replaced the removed sign which the Defendant removed for a second time.[7] The Plaintiff provided an invoice for its costs in replacing the sign which invoice reflects that Plaintiff spent $1,022.[8]

---

7. Defendant's Local Rule 56.1 Statement pp. 16–17. Although Defendant agrees that it has removed and not replaced the sign, in an answer to discovery, it claimed that it has not replaced the sign because the Plaintiff had already replaced the sign. New Seabury Properties, LLC's Answers and Objections to Plaintiffs' First Set of Interrogatories to the Defendants, Answer No. 3.

8. Affidavit of Christopher Burden in Support of Plaintiffs' Motion for Summary Judgment Against Defendants on All Counts, Exhibit 20, Docket No. 193.

2. The Three Way Sign on the Wading Place Road ("Wading Place Sign")

At the time of the Stipulation, the Wading Place Sign appeared as follows:

| Red Brook Road ▷ |
| --- |
| Resort Villas<br>Popponesset Inn<br>Marketplace<br>Real Estate |
| To Route 28 ▷ |

During alteration, the words "Marketplace" and "Real Estate," were deleted; otherwise, the Wading Place Sign remained the same. Today, the sign is the same except that the word "Country Club" has been substituted for "Marketplace." The words "Real Estate" remain deleted. It presently appears as follows:

| Red Brook Road |
| --- |
| Resort Villas<br>◁ Popponesset Inn<br>Country Club |
| To Route 28 ▷ |

On September 17, 2001, Plaintiff wrote to Defendant to remind Defendant again that its actions in altering the permanent signs were a violation of the Stipulation. While the Plaintiff recognized that partial restoration had been made, it asserted that it was not in accordance with the provisions of the Stipulation. It also informed the Defendant that it was undertaking to replace a sign which had not yet been replaced.

Four days later, Wayne J. Kapral ("Kapral"), then General Manager and Chief Financial Officer, sent the following letter to Burden:

As you were advised in the letter hand delivered to your office on September 11, 2001, the placing of any signs on land owned by New Seabury Properties, LLC is not permitted by anyone other than New Seabury Properties, LLC. A large Real Estate sign was installed in land owned by New Seabury Properties, LLC on Rock Landing Road on September 20, 2001. This sign was removed by New Seabury Properties, LLC and is now at our warehouse facility. Please call ... at ... to arrange the return of your sign.[9]

With reference to the temporary signs, the parties agree that in September, 2001, the Defendant decided to implement a new policy regarding the placement of "open house" signs within the Resort. The new

---

**9.** Complaint For Civil Contempt, Breach of Contract, Conversion, Violation of M.G.L. c. 93A and Equitable Relief (the "Complaint"), Exhibit C. Adversary Proceeding No. 02–1325, Docket No. 1.

guidelines, which applied to all brokers, provided that brokers could set up their information inside a conference room on the day of the open house, a central location where prospective purchasers could view all the properties. Also, brokers could display one sign indicating an open house at the location of the property itself. The Defendant provided notice about this change to all brokers and afforded them an opportunity to attend informational meetings. Burden did not attend but a least one person from his office attended one of the meetings. The Plaintiff did not participate in this new program.

On September 11, 2001, Kapral wrote the following to Burden:

> Be advised that the placing of any signs on land owned by New Seabury Properties, LLC is not permitted by anyone other than New Seabury Properties, LLC. Should you currently have signs placed on any of these areas, please remove them immediately. In the event that a sign is placed on such property owned by New Seabury, it will be removed and returned to you in a timely manner.[10]

Both before and after the letter, according to the Plaintiff, temporary signs directing the public to open houses were removed from the Resort. The Plaintiff contends that the sign removal escalated during the 2002 summer selling season during which time the Defendant removed over 20 signs.

Ultimately, the dispute regarding the two forms of signage resulted in the Plaintiff filing the Complaint on August 29, 2002. Counts I and II of the Complaint are for breach of contract based upon the violation of the Stipulation. Count III is for breach of the covenant of good faith

and fair dealing, Count IV is for violation of Mass. Gen. Laws ch. 93A, Count V is for civil contempt, and Count VI is for conversion.

After the Plaintiff filed the complaint, I issued a preliminary injunction in September, 2002.[11] The order provided that the Defendant was enjoined from removing any temporary signage relating to the brokerage operations and would be sanctioned for any violations. The order gave instructions on the amount (6) and placement of signs for open houses.

The Defendant filed an answer largely denying the facts of the Complaint. It also contained counterclaims. With respect to the temporary signs, the Defendant stated that the Plaintiffs' signs are too numerous, a distraction from the aesthetic qualities of the Resort and a safety hazard. The Defendant explained that it set up guidelines for all brokers and that the Plaintiff refused to comply with the guidelines. The Defendant further contended that the Plaintiff has disrupted its relationship with the many brokers on which it will rely to sell new properties to be developed by asserting, in part, that it is the exclusive broker of the Resort. The Defendant argued that the Plaintiff has violated the Stipulation and the Defendant should prevail on its counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, civil contempt, tortious interference with advantageous business relationships, and violation of Mass. Gen. Laws ch. 93A.

Shortly thereafter, I held a pre-trial conference and issued a pre-trial order. In its answer to the counterclaim, the Plaintiff explained that its position is that "real estate brokers who are not advertising property owned by [the Defendant] should not be permitted to place signs within the New Seabury Resort ..."[12] Since January

---

10. Complaint, Exhibit E.

11. Adversary Proceeding No. 02–1325, Docket No. 29.

12. Answer of New Seabury Company Limited Partnership and Christopher Burden to Counterclaim, Docket No. 37, p. 4.

of 2003, the parties have sought and obtained innumerable continuances of the pre-trial order.

In December, 2006, the Defendant moved for summary judgment on Counts I through III of the Complaint. In support, the Defendant contends that even if the temporary and permanent signage were removed as the Plaintiff contends, the Plaintiff will not be able to demonstrate that the damages it alleges it incurred were the result of that action. As such, it cannot, as a matter of law, prevail on the Complaint.

Shortly thereafter, the Plaintiff moved for summary judgment as to liability on all counts of the Complaint. In support, the Plaintiff contends that it is beyond question that the Defendant willfully violated the Stipulation with respect to both the permanent and temporary signage. The Plaintiff asserts that not only have these actions cost them money due to the purchase of replacement signs, but has also had a significant detrimental effect on the business of the Plaintiff.[13] The Plaintiff requests that it be able to demonstrate its damages at an evidentiary hearing on damages.

The parties filed briefs and affidavits in support and filed oppositions to the cross-motions. They all rely on the depositions of Kapral ("Kapral Deposition"), Albo J. Antenucci Jr. ("Antenucci"), former president and chief executive officer of American Property Investors, Inc., the general partner of American Real Estate Holdings Limited Partnership, which is the owner of the Plaintiff ("Antenucci Deposition"), Christopher Burden ("Burden Deposi-

tion"), Daniel E. Rosenfeld, counsel to the Defendant ("Rosenfeld"), and John Monaghan, counsel to the Plaintiff ("Monaghan"). The Plaintiff also relies on the affidavit of Stephen Kalos ("Kalos"), its expert witness. I held a hearing on the motion where the parties repeated and elaborated on the foregoing arguments. The parties subsequently filed reply briefs.

## III. POSITION OF THE PARTIES

### A. The Defendant

The Defendant adamantly asserts that its alteration of the permanent signs and removal of the temporary signs in no way violated the terms of the Stipulation and, even if that were the case, the Plaintiff is not entitled to summary judgment as it was not damaged by the Defendant's actions. As such, the Defendant urges the Court to grant it summary judgment on Counts I, II, and III and deny the Plaintiff's request for summary judgment.

With respect to the temporary signage, the Defendant explains that beginning in 1999, it began to place limits on the Plaintiff's placement of temporary signage.[14] It does not explain the reasons for this policy except that Kapral, the former general manager, determined that "reasonable" under the Stipulation allowed him to curtail prior signage placement. Kapral decided that the Plaintiff was permitted to place open house signs at the ingress and egress of the Resort on the day of the open house so long as they did not block any other signs or flower beds and were not on the golf course. The Defendant contends that the Plaintiff never objected

---

**13.** The Defendant contends that the facts demonstrate that approximately 50 signs were removed and that the Plaintiff recovered twelve of them. The Defendant further contends that many of the removed signs were removed by persons other than any of their employees.

**14.** During the beginning of July, 1999, the Defendant hired Kapral. Kapral explained during the Kapral Deposition that he reviewed the Stipulation at the beginning of his employment but it took him "many, many, many months" to appreciate the depth of the Stipulation.

to this policy and indeed it appears from the pleadings that the Plaintiff did not object to this adjustment.

The Defendant further explains that in mid–2001, it implemented the aforementioned formal policy regarding placement of open house signs applicable to all brokers. It contends that its implementation was consistent with the terms of the Stipulation because it was reasonable. In its answer to admissions, the Defendant states that "the term 'reasonable' has not been altered by New Seabury. However, the parties chose the word 'reasonable' to provide themselves with flexibility, understanding that what is objectively reasonable may change over time depending on individual circumstances." [15] The Defendant further contends that the concerns of other brokers should be taken into account in determining what temporary signage is reasonable because the Plaintiff is not the exclusive broker in the Resort.[16]

In its pleadings, the Defendant also claims that this policy was implemented as a result of increased signage and community complaints. Separately, the Defendant explained that the new guidelines were implemented "in part at the behest of other real estate brokers who desired to advertise their listings within the New Seabury Resort, and as a means of encouraging and increasing competition so that the market values of properties in the New Seabury Resort would rise, benefitting New Seabury, as well as the real estate brokers, including Plaintiffs." [17] The Defendant contends that without this competition between brokers, its attempt to use these brokers will be harmed when it needs to sell the numerous new properties it is developing.[18]

Antenucci testified that the new policy was implemented to avoid accidents on the property in the event that the real estate broker open house signs were too numerous.[19] He explained that at that time, he had no knowledge of the Stipulation.[20] In describing the new policy with respect to the open house signs, Antenucci stated:

> Mr. Burden obviously felt—he did what he obviously felt he had the right to do, which in fact after he filed the lawsuit and we got the injunction that we realized that he did have that right to do that. And we immediately both from the permanent signage and the temporary signages—we screwed up, and we immediately rectified that. End of story.[21]

The Defendant asserted that it would remove any signs that offended the policy, stack them up, and make them available the following week. The Defendant argues that because the Plaintiff opted not to participate in this new program, it failed to mitigate its damages. Failure to mitigate damages, it contends, is fatal to any breach of contract claim.

The Defendant, without notice to the Plaintiff, began to alter the permanent

15. New Seabury Properties, LLC's Answers and Objections to Plaintiffs' First Set of Requests for Admissions of Defendants, Response to Request No. 38.

16. New Seabury Properties, LLC's Answers and Objections to Plaintiffs' Fist Set of Interrogatories to the Defendants, Answer No. 11.

17. New Seabury Properties, LLC's Answers and Objections to Plaintiffs' Fist Set of Interrogatories to the Defendants, Answer No. 14.

18. *Id.* at Answer No. 16.

19. Antenucci Deposition, p. 91.

20. *Id.* at 74.

21. *Id.* at 91. Antenucci submitted a subsequent affidavit to clarify this statement. He contends that he was referring only to temporary signage and that he meant to say that the policy was in conflict with the Injunction. Affidavit of Albo J. Antenucci, Jr., Docket No. 217.

signage in April 2001. It contends that when it began the project, it mistakenly painted over some references to the Plaintiff. It describes that by the end of May, 2001 it had replaced the lettering on nearly all the signs. In June, 2001, the Defendant began an overhaul of the permanent signage within the Resort to make the Resort more attractive and safe as the signs were decaying. The Defendant contends that new signs comply with the Stipulation in that they provide equal visibility with all of the other directions on the sign. There is equal visibility because references to all parties on the refurbished signs are of the same size and font and therefore they all enjoy equal visibility.

With respect to its lack of damages defense, the Defendant contends that the Plaintiff's own logs reflect that its market share sustained no negative impact during the time that the temporary signage placement was curtailed and/or the permanent signs were altered. In fact, the Defendant contends that the Plaintiff's records establish that it obtained more business after the policy regarding signs was implemented. Even if there had been a negative impact, however, the Defendant contends that the Plaintiffs cannot establish that the cause was due to the Defendant's actions.

In a supplemental brief, the Defendant seeks to either disqualify the Plaintiff's expert or obtain a ruling that the expert's methodology is unreliable. In support, the Defendant explains that the Plaintiff's expert, Kalos, is not an expert in real estate or the marketing thereof and, as such, his testimony should be inadmissable. Even if he were qualified, the Defendant claims that Kalos' testimony is fundamentally flawed due to poor methodology. That is, Kalos relies upon Burden to establish that the alteration of the permanent and tem-

porary signs caused a downturn in the Plaintiff's revenue rather that conducting independent analysis. His analysis is particularly poor when taking into account the fact that he ignored that post-confirmation the Defendant permitted other brokers to market at the Resort. As such, the testimony is inadmissable under the *Daubert* rule.[22]

With respect to the Plaintiff's argument that removal and/or alteration of the signage was willful, the Defendant disagrees. It contends that the actions it took were the result of complaints from residents and in accordance with its interpretation of the Stipulation. The Defendant argues that there is no evidence to suggest otherwise. For these same reasons, the Defendant contends that it did not violate Mass. Gen. Laws ch. 93A, the laws against conversion, or the terms of the Stipulation itself. The Defendant contends that the Plaintiff is not entitled to summary judgment on its count for contempt because the term "reasonable" is capable of many interpretations and because the Stipulation did not contain sufficient guidance, contempt cannot be concluded.

### B. The Plaintiff

The Plaintiff asserts that there are no facts in dispute. The Defendant wilfully removed both the permanent and temporary signs in contravention of the express terms of the Stipulation and as a result the Plaintiff has suffered damages.

With respect to the temporary signs, the Plaintiff contends that with the exception of one earlier incident, the temporary signage was not at issue until the Defendant instituted its formal policy in 2001. Burden explained that due to the complex road structure within the Resort, up until that

---

**22.** *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

time, the Plaintiff would place between 3 and 6 temporary signs to direct parties.[23] The Plaintiff contends that between September, 2001 and the entry of the injunction, the Defendant removed all open house signs despite its knowledge of the terms of the Stipulation. Likewise, Burden further explained that after removal of the directional signs, foot traffic at the open houses declined and some were unattended. Moreover, the Plaintiff has incurred damages in having to purchase replacement signs.

With respect to the permanent signs, Plaintiff contends that at least seven were painted to delete references to the Plaintiff. It contends that the deposition testimony reflects that this was done willfully. In support, the Plaintiff directs the Court to Kapral's deposition in which he testified that the reason that the words "Real Estate" and "Marketplace" were painted over "had to do with us remarking businesses that we didn't control."[24] Antenucci testified that the permanent signs were altered because "we thought Mr. Burden did not have any rights to be on that sign."[25] He recognized that at the time of that decision, he was not aware of the Stipulation and that in altering the signs, "[w]e screwed up."[26] The Plaintiff contends that it incurred damages in replacing a permanent sign which the Defendant subsequently removed.

In addition to the costs it incurred in replacing signs, the Plaintiff provided Kalos' affidavit to support its contention that it has incurred significant damages.[27] Kalos is an economist and is the vice president of a economic and business consulting firm where he has worked since 1994. He explains that during the last 30 years "I have consulted and testified on economic issues in commercial litigation matters, including the assessment of economic damages."[28] With respect to the effect of the alterations of the temporary and permanent signs, Kalos offered:

> Based on my background and experience, and the factual circumstances of, and my research regarding, this case, it is my opinion that the primary and proximate cause of the relevant decline in the Plaintiffs' share of the market, with the market being defined as the general brokerage of privately held properties located within the New Seabury community, was the Defendants' exercising control over the Plaintiffs' permanent and temporary signs starting in late spring, 2001 and continuing, with regard to the temporary signs, through at least September, 2002 when the Bankruptcy Court issued a temporary restraining order prohibiting the conduct complained of . . .
>
> My opinion is reinforced by the fact that the timing of the drop in the Plaintiffs' market share coincides precisely with the activity of the Defendants that is the subject of this litigation . . .
>
> In sum, it is axiomatic that a reduction in visibility of a particular real estate company, particularly a market leader, within any community will cause that company's market share to decline. In that circumstance, the market leader's competitive advantage is reduced allowing competitors to attract buyers who would not otherwise have been available and making prospective sellers less likely to view the market leader as the most

---

23. Burden Affidavit, p. 3.

24. Kapral Deposition, p. 168.

25. Antenucci Deposition, p. 118.

26. *Id.* at 119.

27. Affidavit In Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Kalos Affidavit").

28. Kalos Affidavit, p. 1.

effective agency to broker their listings. . . .

As a result of the loss in market share caused by the Defendants' conduct, I have concluded within a reasonable degree of economic certainty that the Plaintiffs have suffered economic loss of $906,764 as of September 30, 2006, without interest.[29]

With respect to the first two counts, the Plaintiff contends that it is entitled to summary judgment because it has demonstrated that (1) that there was a contract with the Defendant; (2) the Defendant breached the contract; and (3) the Plaintiff incurred damages as a result of the breach. The Plaintiff contends that at this juncture, it only seeks to establish liability and that it will provide evidence of its damages, including economic damages in the form of lost revenue, during an evidentiary hearing. To the extent that some damages must be established, the Plaintiff contends that it at least incurred damages when it replaced its temporary and permanent signs.

With respect to Count III, the Plaintiff contends that the Defendant's actions with respect to the temporary signs (removing them every week) and the permanent signs (painting over references or removing signs altogether) when it was fully cognizant of the terms of the Stipulation demonstrates it breached its covenant of good faith and fair dealing. In response to the Defendant's contention that the Plaintiff cannot show that the Defendant caused its damages, the Plaintiff argues that the Defendant has misstated its burden of proof, and has misapprehended both the Plaintiff's evidence and the Defendant's actions.

With respect to Count IV, the Plaintiff contends that the foregoing acts establish that the Defendant engaged in unfair and deceptive trade practices. The acts of the Defendant are not merely a breach, but are so willful as to equal the facts of cases where courts have found ch. 93A violations. With respect to Count V, civil contempt, the Plaintiff contends that this Court may enforce its own orders by finding the Defendant in civil contempt. Under the case law from this district, the Plaintiff contends, I can impose sanctions if I find that the Defendant was aware of the terms of the Stipulation, which no one disputes was an order,[30] and failed to comply with those terms. The Plaintiff contends that the Defendant's wilful failure to comply is abundantly clear from the deposition testimony.

With respect to Count VI, conversion, the Plaintiff contends that it is able, based upon the deposition testimony to establish all of the counts of the offense. The Plaintiff, however, seeks only summary judgment as to liability and requests an opportunity to establish damages at a later date.

In response to the Defendant's motion for summary judgment on Counts I–III, the Plaintiff claims that the Defendant has misrepresented the Plaintiff's burden of proof with respect to damages. Moreover, the Plaintiff contends that at a minimum, it has demonstrated that it has suffered out of pocket expenses in repurchasing one stand-alone sign and several new temporary signs. It need not, as the Defendant suggests, prove causation of damages by an absolute certainty. The Plaintiff contends that there are ample cases where the proof was as the Plaintiff offers, evi-

---

29. Kalos Affidavit, pgs. 3–6.

30. In support, the Plaintiff cites to *Bezanson v. Bayside Enterprises Inc. (In re Medomak Canning)*, 111 B.R. 371, 374 (D.Me.1990), *aff'd*, 922 F.2d 895, 900 (1st Cir.1990) for the proposition that the Stipulation can be both an order of the Court and a contract between the parties.

dence of earnings and future earnings, and testimony of management and an expert. The Plaintiff contends that Kalos amply identified the causal connection between the Defendant's action and the Plaintiff's loss of market share. As such the Defendant's claim with respect to damages is unwarranted.

The Plaintiff also contends that the logs upon which the Defendant relies to establish lack of damages is not credible evidence. That is, the logs with respect to potential buyers do not demonstrate the business that may have been lost representing sellers. The Plaintiff argues that this information would be more probative. The Plaintiff explains that it runs its business within the Resort, which is the body from which it obtains its business from potential sellers. It lost market share when it lost two valuable pieces of its marketing program, the signs to the office and the signs to the properties.

The Plaintiff also contends that even if the Defendant is successful with respect to its argument for lack of damages, it should not prevail on its request for summary judgment because the Plaintiff has asked for a permanent injunction for each of those counts.

## IV. ANALYSIS

### A. Summary Judgment Standard

Summary judgment should only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [31] The burden of proof is upon the moving party in the first instance.[32] To defeat the motion, the opposing party must produce substantial evidence of a genuine dispute as to a material fact.[33] A material fact is one which has the "potential to affect the outcome of the suit under applicable law." [34]

### B. Breach of Contract

■ The parties do not dispute this straightforward standard. In order to prevail, the Plaintiff must first establish that there was (1) a contract; (2) a breach occurred; and (3) the Plaintiff suffered damages as a result of the breach.[35] The parties do not, and indeed cannot, dispute that the Stipulation is a contract.[36]

■ The Plaintiff contends that a breach occurred when (1) the Defendant began implementing the formal policy regarding open house signs which caused the weekly removal of its signs; and (2) the Defendant altered and/or removed the permanent signs. The Defendant contends that it did not breach the Stipulation because its formal policy afforded the Plaintiff the opportunity to place reasonable temporary signage and that the altered signs provided signage of equal visibility.

---

**31.** Fed. R. Bankr.P. 7056 (incorporating Fed. R.Civ.P. 56(c)).

**32.** *Steel Hector & Davis v. Wang Laboratories, Inc. (In re Wang Laboratories, Inc.)*, 155 B.R. 289, 290 (Bankr.D.Mass.1993).

**33.** *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 763 n. 1 (1st Cir.1994); *Darr v. Muratore*, 8 F.3d 854, 859 (1st Cir.1993); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

**34.** *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993).

**35.** *Michelson v. Digital Financial Services*, 167 F.3d 715, 720 (1st Cir.1999); *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996).

**36.** *New Seabury Co. L.P. v. New Seabury Props. LLC (In re New Seabury Co. L.P.)*, 450 F.3d 24, 33 (1st Cir.2006) (recognizing stipulations, the one at issue in particular, are treated as contracts.).

From 1998 until 2001, with slight exception, the parties implemented the Stipulation such that the Plaintiff placed approximately 3 to 6 signs per open house on the Defendant's "post-confirmation New Seabury related property" without objection from the Defendant. In 2001, the Defendant unilaterally decided for apparently numerous different reasons that the Plaintiff could not place any open house signs on its "post-confirmation New Seabury related property," but rather only one sign on the homeowner's property and informational material in the conference room. After three years of an understanding of the Stipulation, the Defendant decided, without consulting the Plaintiff prior to the change in policy, that the parties had chosen the word "reasonable" to provide themselves with flexibility, understanding that what is objectively reasonable may change over time depending on individual "circumstances." Indeed, the Defendant appears to have changed how it viewed the signage placement and wording based upon its sole perception of the circumstances at the Resort. The circumstances that it has articulated in its pleadings were alternatively resident complaints, traffic safety, control of the aesthetic, and/or leveling the playing field for other brokers in order that the Defendant could enter into the good graces of other brokers.

There is nothing in the wording of the Stipulation, however, that suggests that the parties intended unilateral flexibility and concern for individual circumstances.

Had they been so concerned, they would and could have offered a mechanism for making such changes.[37] Indeed, if the term were defined as the Defendant suggests, "to ensure flexibility among the parties," then it would be interpreted to mean that the reasonable placement would be changed after the parties jointly had agreed to a new placement. The facts of this case reflect that it was the Defendant who unilaterally decided to change the definition of reasonable, and in so doing, simply turned a blind eye to the words "on NSP's post-confirmation New Seabury related property."

■ The quibble of the parties rests with the definition of the phrase "reasonable temporary signage . . . on NSP's post-confirmation New Seabury related property." "The meaning of a contract cannot be understood merely by 'isolating words and interpreting them as though they stood alone.' "[38] Context may be used as a tool to find unambiguous meaning.[39]

■ If a term is ambiguous, there is a reasonable difference of opinion as to the meaning, then the court may look to the parties' intent.[40] The parties' subsequent conduct will greatly inform the court's interpretation of intent.[41]

At the time the parties entered into the Stipulation, the Plaintiff was to retain its brokerage business. That brokerage business included placing temporary direction-

---

37. *See New Seabury Co. L.P. v. New Seabury Props. LLC (In re New Seabury Co. L.P.)*, 450 F.3d 24, 27 (1st Cir.2006) ("The parties would scarcely have overlooked mention of inclusion of a substantial share of the comingled cash from the operating account, and the amount thereof, has this, too, been part of their completed bargain especially where it would be unclear simply from the general language in paragraph 9 how much of an uncertain amount of cash Debtor was to retain, if it was to retain any at all.").

38. *McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 287, 298 (1st Cir.2004).

39. *Id.*

40. *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 723–4, 363 N.E.2d 688 (1977).

41. *Pittsfield & N.A.R. Corp. v. Boston & A.R. Co.*, 260 Mass. 390, 398, 157 N.E. 611, 614 (1927).

al signs around the Resort to guide potential buyers to properties being sold. The operative words required that the signs be reasonable. Black's Law Dictionary defines "reasonable" as "[f]air, proper, just, moderate, suitable under the circumstances. Fit and appropriate to the end in view."[42] The end in view is the Plaintiff's ability to retain its real estate business and sell properties. That was the sole context under which the parties entered into the Stipulation.[43] The Stipulation requires that the Plaintiff be able to place temporary signs on the Defendant's property and not just on the property of the seller. I find that the wording of the Stipulation is unambiguous and allows the Plaintiff to place a reasonable amount of temporary signs around the resort during an open house. A reasonable amount would be that which the temporary injunction now allows. That the Defendant has decided for various reasons to limit other brokers based upon what it believes to be reasonable is not a reflection on how the parties viewed the Stipulation at the time that they executed the agreement and the Plaintiff will not be bound by the Defendant's subsequent policies.[44] Even if I were to determine that the phrasing in the Stipulation regarding the temporary signs were ambiguous, I would conclude that the subsequent course of conduct between the parties established that the Plaintiff can place a small number of temporary signs around the Resort on the days of an open house.

■ With respect to the permanent signs, there is no dispute that the Defendant has removed two signs without replacement and without consulting the Plaintiff. This is not a change in permanent signage, which the Stipulation allows for, but rather an impermissible alteration in the configuration of the permanent signs. With respect to the remaining signs at issue, the Plaintiff correctly points out that they appear to have been altered so that references to the real estate office would occupy a less prominent location. I need not decide whether these altered signs are of "equal visibility" as that phrase appears in the Stipulation as I have already concluded that the Defendant breached the Stipulation with respect to the placement of the temporary signs and with respect to the two permanent signs which it permanently removed.

The remaining issue for this count is damages. The Plaintiff asks that I only determine liability and assess damages at a later hearing. At a minimum, however, it contends that it suffered out of pocket damages with respect to the temporary signs and the permanent sign it purchased.[45] The Defendant contends that the Plaintiff's books and its expert witness reflect that the Plaintiff lost no market share during the time that it was removing or altering signs. Indeed, the Defendant requests that the Court disregard Kalos' testimony altogether. Again, I disagree.

■ The Defendant relies on *Daubert* in support of its request that I strike Kalos' testimony.[46] In that case, the Supreme

---

42. *Black's Law Dictionary* 1265 (6th ed.1990).

43. The Defendant provided testimony that issues such as aesthetic and numerous open house signs were not considered at the time that the parties entered into the Stipulation.

44. Indeed, unlike the other brokers whose signs allegedly cluttered the Resort after the parties entered into the Stipulation, the Plaintiff and Defendant have a contract/court order regarding temporary signs. The Plaintiff is simply in a different category then all other brokers at the Resort.

45. The Defendant contends that it returned to the Plaintiff most, if not all, of the signs it removed. The Plaintiff's evidence to the contrary is more credible.

46. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Court ruled that with respect to scientific evidence, a trial court must ensure that an expert's testimony has a reliable foundation and is relevant. Certainly, I "may exclude expert testimony where [I] find[ ] that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence."[47] In this case, however, I have insufficient information to determine whether Kalos' assumptions are incorrect or his evidence speculative. I will take into consideration his background and methodology when I decide the weight to give to his testimony. At this stage, however, these elements are sufficiently credible to withstand such a request.[48] Kalos' testimony, combined with Burden's affidavit and the initial proffer of damages are sufficient to demonstrate that there is a genuine dispute as to damages and I will consider the issue at a further evidentiary hearing. Indeed, it may be the case that I will not use that Kalos' testimony to determine damages. Until then, I will enter judgment for the Plaintiff on Counts I and II as to liability only.

## C. Breach of the Covenant of Good Faith and Fair Dealing

 In Massachusetts, every contract contains an implicit agreement that there will be good faith and fair dealing between the parties.[49] As such, the parties may not engage in any conduct that impede the other from obtaining the fruits of the contract.[50] Both sides seek summary judgment on this count. The Defen-

dant contends that there is no evidence that it willfully or intentionally breached the Stipulation. The Defendant contends that the deposition testimony reflects that the Defendant understood its formal policy with respect to the temporary signs were consistent with the Stipulation.

That assertion is not entirely correct and does not address the matter of the permanent signs. Kapral's deposition testimony reflects that he was the one who suggested the formal policy and discussed the matter with Antenucci. Antenucci testified that he only became aware of the Stipulation at the time of the injunction. Kapral knew of the Stipulation when he initiated the policy with respect to the temporary signs and when he and Antenucci caused the permanent signs to be altered. In September, 2001, counsel for the Defendant conferred with outside counsel regarding the terms of the Stipulation. In-house counsel was intimately familiar with the terms of the Stipulation as she worked for outside counsel to the Defendant on the matter at the time the Stipulation was drafted and signed.

At the time the permanent signs were altered, Antenucci explained that they took that action because "we thought Mr. Burden did not have any rights to be on that sign."[51] Kapral stated that he painted over the word "Real Estate" and "Marketplace" because "it had something to do with us remarking businesses that we didn't control."[52] He also testified that he

---

47. *Casas Office Machines, Inc., v. Mita Copystar America, Inc.,* 42 F.3d 668, 681 (1st Cir. 1994).

48. *See e.g. Den Norske Bank AS v. First Nat'l. Bank of Boston,* 75 F.3d 49, 58 (1st Cir.1996) ("At summary judgment, moreover, courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant. . . ."); *Tamen v. Alhambra World Investment, Inc. (In re Tamen),* 22 F.3d 199, 206 (9th Cir.1994).

49. *Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991).

50. *Id.*

51. Antenucci Deposition, at p. 118.

52. Kapral Deposition, p. 168.

received orders from the head office to alter the signs. When Kapral oversaw the painting of the permanent signs and the removal of a replacement sign, he was familiar with the terms of the Stipulation. This testimony reflects that the Defendant knew of the terms of the Stipulation and simply ignored them. By this conduct, the Plaintiff was denied two significant marketing tools which under the Stipulation were supposed to continue to survive. I will enter an order granting summary judgment for the Plaintiff as to liability only. Defendant's cross-motion with respect to this count is denied.

### D. Violation of Mass. Gen. Laws ch. 93A

 Having found a breach of the implied covenant of good faith and fair dealing, I may also conclude that the Defendant has violated Mass. Gen. Laws ch. 93A.[53] As the First Circuit explained, "Chapter 93A liability may exist if the defendant's conduct falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or is 'immoral, unethical, oppressive or unscrupulous.' ... Thus proof of a common law tort, while not necessary for liability may be sufficient." [54]

 While I recognize that duplicative damages are not available, I may multiply damages under ch. 93A. I will make that determination at the time of the evidentiary hearing on damages. The Plaintiff shall be awarded summary judgment as to liability on this count.

### E. Civil Contempt

 Bankruptcy courts are vested with contempt power.[55] The First Circuit further explained that "[s]anctions in a civil contempt proceeding are employed to coerce the defendant into compliance with the court's order or, where appropriate, to compensate the harmed party for losses sustained. These sanctions are not punitive, but purely remedial." [56] Much like the standard in Massachusetts,[57] in considering a matter involving civil contempt, the bankruptcy court must determine whether the contemnor knew of the order, whether the order was clear, the contemnor could comply with the order and whether the contemnor complied with the order.[58] The Defendant contends that the term "reasonable" was ambiguous and therefore the

---

53. Mass. Gen. Laws ch. 93A, § 11 provides that any "person who engages in the conduct of any trade or commerce and who sufferers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two ... may, as hereinafter provided bring an action...." *See also Anthony's Pier Four, Inc.*, 411 Mass. at 474, 583 N.E.2d 806; *Cherick Distrib., Inc. v. Polar Corp.*, 41 Mass.App.Ct. 125, 128, 669 N.E.2d 218 (1996).

54. *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir.1996) (citations omitted).

55. *See Eck v. Dodge Chem. Co. (In re Power Recovery Systems, Inc.)*, 950 F.2d 798, 802 (1st Cir.1991); and *Parker v. Boston University (In re Parker)*, 334 B.R. 529, 538 (Bankr. D.Mass.2005). *See also* 11 U.S.C. § 105(a).

56. *Eck v. Dodge Chem. Co. (In re Power Recovery Systems, Inc.)*, 950 F.2d 798, 802 (1st Cir.1991) (Footnotes omitted).

57. In Massachusetts, a party may be held in civil contempt only if the underlying court order contained a "clear and unequivocal command" and the failure to comply was of the same description. *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 565, 677 N.E.2d 159, 200 (1997).

58. *See, e.g. U.S. v. Saccoccia*, 433 F.3d 19, 27 (1st Cir.2005); *In re 1747 West Main Corp.*, 198 B.R. 639, 642 (Bankr.D.R.I.1996).

terms of the Stipulation were not clear and unequivocal. In my discussion regarding the breach of contract claim, I explained that the term was not ambiguous and that what was required under the Stipulation was clear. Indeed, during the first few years after my approval, the parties understood and complied with the terms of the Stipulation.

The Defendant contends that there is no evidence that it intended to violated the Stipulation or that it knew that it was violating the Stipulation. The deposition testimony provides otherwise. The Defendant was well aware of the terms of the Stipulation.[59] It had been able to comply with the same for the first few years after my approval. Kapral knew of the terms at the time he implemented the temporary sign guidelines and when he altered the permanent signs. Inhouse and outside counsel were familiar with the Stipulation and were consulted at the time the Defendant implemented the policy of removing and altering signs. That the Defendant seems to have failed to show Antenucci a copy of the Stipulation until after I entered the injunction has no bearing on the matter. The Defendant was familiar with the Stipulation and its clear terms.

The pleadings amply reflect that the Defendant knew of the Stipulation, the Stipulation was clear and the Defendant was able to comply with the Stipulation. The last question on this count is whether the Defendant violated that portion of the Stipulation that is at issue in this adversary proceeding. The answer is a resounding yes. The Defendant removed open house signs that prior thereto had been considered by both parties to be rea-

sonable. The Defendant altered and removed and did not replace permanent signs.[60] Based upon the forgoing, I will enter summary judgment for the Plaintiff as to liability.

### F. Conversion.

 Under Massachusetts law, the "elements of conversion any be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment."[61] In this case, the Defendant removed the Plaintiff's open house signs for roughly a year. It removed a sign which the Plaintiff had paid to re-install. The Plaintiff was placing and replacing its signs in accordance with the Stipulation. The Defendant has not suggested that it had the authority to exercise control over the Plaintiff's signs other than its unilateral change in policy. Accordingly, I will likewise grant the Plaintiff summary judgment on this count and afford it an opportunity to establish its damages at a later time.

### V. *Conclusion*

For the reasons set forth herein, I will enter an order granting the Plaintiff summary judgment as to liability on all of the counts of its complaint. I will enter an order denying the Defendant's request for summary judgment on Counts I—III. I will schedule a preliminary non-evidentiary hearing with respect to actual damages.

---

59. *See New Seabury Co. L.P. v. New Seabury Props. LLC (In re New Seabury Co. L.P.),* 450 F.3d 24 (1st Cir.2006).

60. Again, here I need not decide whether the altered signs provide "equal visibility."

61. *In re Hilson,* 448 Mass. 603, 611, 863 N.E.2d 483, 491 (2007).